UNITED STATES of America,
Plaintiff-Appellee,

v.

David SILVERMAN,
Defendant-Appellant.

No. 83–1314.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 12, 1984.

Decided Sept. 16, 1985.

Brian L. Sullivan, Asst. U.S. Atty., Reno, Nev., for plaintiff-appellee.

Bruce M. Kaufman, Sherman Oaks, Cal., for defendant-appellant.

Before WALLACE, ALARCON and NELSON, Circuit Judges.

NELSON, Circuit Judge:

David Silverman appeals his conviction for conspiracy to distribute a controlled substance (cocaine) and three related offenses. Silverman claims that the district court improperly admitted statements under Fed.R.Evid. 801(d)(2)(E)(FRE) and erred in giving a "modified flight" jury instruction. We affirm his conviction.

FACTUAL AND PROCEDURAL BACKGROUND

Silverman was indicted on August 23, 1983, by the Federal Grand Jury for the District of Nevada, for conspiracy to distribute a controlled substance; possession with intent to distribute a controlled substance; aiding and abetting; and interstate travel in aid of racketeering, in violation of 21 U.S.C. § 846 and § 841(a)(1) and 18 U.S.C. § 1952(a)(2) and (3). Silverman was tried together with his sister, Pearl Phoenix, and her husband, David Phoenix. The main witness against all three was a government informant, David Willard, who testified to the existence of a conspiracy to distribute cocaine involving Silverman as the supplier, Pearl Phoenix as the wholesaler, and Willard as the retailer.

Willard testified that he obtained cocaine from Pearl Phoenix. Sometime in 1982, he began to sell large quantities of cocaine to Robert Zeitziff. Zeitziff volunteered his private plane for trips to Los Angeles, where Pearl obtained her cocaine. Zeitziff, Willard, and Pearl made three flights to Los Angeles in Zeitziff's plane.

The first trip took place on May 13, 1983, when Zeitziff flew Pearl and Willard to Van Nuys, California. According to Willard, Pearl had told him earlier that "her brother," who lived near Van Nuys Airport, was her source of cocaine. Upon landing at Van Nuys, Willard called Valley Cab to request a cab for Pearl; Pearl went to a phone booth to make a call. Willard stated that Pearl had told him earlier that she was going to call her brother. Pearl then left alone in the cab. Cab records admitted into evidence showed that on May 13, a passenger was picked up at the Van Nuys terminal and was dropped off at the corner of Ventura and Louise, an intersection near David Silverman's residence. Two or three hours later, Pearl returned with cocaine and then she, Zeitziff and Willard flew back to Reno, Nevada.

On May 31, the same trio again flew to Van Nuys. Willard again called Valley Cab, and Pearl again left to make a phone call, having told Willard that she had to call her brother. Cab records showed that a passenger was picked up on that date at Van Nuys airport and was dropped off at the corner of Winnetka and Ventura, another intersection close to Silverman's residence. Cab records also showed that a passenger was picked up just over one hour later at the same corner and driven to the Van Nuys terminal. After Pearl returned with cocaine, the three returned to Reno.

On June 17, 1983, the same parties made a third trip to Van Nuys. As on the first two trips, Willard called Valley Cab and Pearl made a phone call. Cab records show that a passenger was driven on that date from the airport to Silverman's residence, and a cab driver identified the passenger as Pearl. Willard testified that

Pearl had earlier instructed him to wait by the phone for a call at about five o'clock. Pearl called Willard to say she was on her way back to the airport. Shortly thereafter, a car stopped near the terminal. At trial, Willard stated that the driver was a male who "look[ed] like Silverman," but at that time Willard and Silverman had never met. Willard had seen a photograph of Silverman, however. Pearl got out of the car, and, again according to Willard, gave Willard a leather pouch containing six ounces of cocaine. Pearl informed Willard that she was going to go to San Francisco and would not go back to Reno with him and Zeitziff, then returned to the car, which was waiting for her. Willard and Zeitziff flew to the airport at Stead, Nevada, and, while driving to Reno, were stopped and arrested by the Reno Police Department for possession of six ounces of cocaine.

Following his arrest and subsequent indictment for possession of cocaine, interstate racketeering, and conspiracy, Willard entered into a plea bargain negotiation with the government and agreed to cooperate in an investigation. Willard subsequently taped a number of conversations between himself and the Phoenixes. During one of the conversations between Willard and Pearl, Willard asked her if her brother was "cool" with respect to money allegedly owed to him. Pearl replied, "Don't worry." The tapes, played to the jury, also contain other references to Silverman.

Two months after Willard's arrest, agents of the Drug Enforcement Administration (DEA) knocked on the door of Silverman's house. Silverman came to the door and stated that David Silverman was not at home; the agents left a message for Silverman to call the DEA to answer some questions. He called soon after. When the agents returned that afternoon with a warrant for his arrest, he gave a false identity and again claimed that David Silverman was not home. Within an hour, his attorney called the DEA and arranged for Silverman to turn himself in two days later,

which he did. He obtained a reduction in bail based upon his surrender.

Silverman was convicted by jury verdict on October 28, 1983, and was sentenced December 19, 1983. Judgment of conviction was entered on December 23, 1983. He filed this appeal on December 19, 1983. Our jurisdiction is based on 28 U.S.C. § 1291.

## ISSUES PRESENTED

I. Whether statements implicating Silverman as a cocaine supplier were properly admitted as co-conspirator statements under FRE 801(d)(2)(E).

(A) The amount of evidence of Silverman's "connection" to the conspiracy.

(B) Whether the hearsay statements were made "during" and "in furtherance of" the conspiracy.

II. Whether the jury instruction on Silverman's "flight" was properly given.

## DISCUSSION

I. *Co-conspirator statements.*

█ Silverman contends that statements implicating him as the source of cocaine for Pearl Phoenix were improperly admitted under FRE 801(d)(2)(E). Co-conspirator statements are admissible under this hearsay exception only if the trial judge determines that a proper foundation exists. A proper foundation consists of proof, independent of the statements themselves, to establish a *prima facie* case for (1) the existence of the conspiracy and (2) the defendant's connection to and knowing participation in the conspiracy. The trial court also had to find that the challenged statement was made (3) during the course of and (4) in furtherance of the objectives of the conspiracy. *See United States v. Miranda-Uriarte,* 649 F.2d 1345, 1349 (9th Cir.1981); *United States v. Freie,* 545 F.2d 1217, 1223 (9th Cir.1976) (per curiam), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977).

The trial court stated that, absent hearsay evidence, Silverman's membership in the conspiracy could not be established. It admitted two crucial pieces of evidence un-

der FRE 801(d)(2)(E). The first was Pearl's statement to Willard that her brother David Silverman was her cocaine source. The second was Pearl's response to Willard's question in a telephone call after he had become an informant: "Is your brother cool [concerning delay in paying for the cocaine]?" Pearl's response was "Don't worry." Silverman's attorney objected at trial to the admission of both statements, alleging that the evidence linking Silverman to the conspiracy was insufficient to admit the statements under FRE 801(d)(2)(E) and that neither statement was made "in furtherance of the conspiracy." The district judge ruled that the foundation was sufficient because there was independent evidence of a slight connection between Silverman and the conspirators. Silverman contends, on appeal, that the district judge erred and the statements were erroneously admitted.

A. *Silverman's connection to the conspiracy*

█ Silverman contends that *de novo* review is proper on the issue whether he was connected to the conspiracy. Review of a *prima facie* case of conspiracy, the first prong of the test, has been established as *de novo* in this Circuit. *United States v. Layton,* 720 F.2d 548, 556 n. 4 (9th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984); *United States v. Rosales,* 584 F.2d 870, 872 (9th Cir.1978). The evidence of the defendant's connection to the conspiracy must also constitute a *prima facie* case. *See, e.g., Miranda-Uriarte,* 649 F.2d at 1349–50; *United States v. Weiner,* 578 F.2d 757, 769 (9th Cir.) (per curiam), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978); *United States v. Testa,* 548 F.2d 847, 853 (9th Cir.1977). We agree with Silverman and will review the evidence of his connection to the conspiracy *de novo* to determine whether it established a *prima facie* case.

█ Silverman does not contend that a conspiracy did not exist, but rather that he was not knowingly connected to it. Therefore, the real issue in this case is whether

the government established a *prima facie* case of Silverman's connection to the conspiracy. Since the foundation requires evidence independent of the hearsay statements, we must divide the evidence into hearsay and non-hearsay evidence. The non-hearsay evidence of Silverman's involvement in the conspiracy included Pearl's statements to Willard, upon each arrival in Van Nuys, that she had to call her brother. Since the defense did not object to the first statement, it was admitted for the truth of the matter asserted. The judge told the jury to consider the second two statements only for the proposition that Pearl made the statements to Willard, thus removing the statements from the FRE 801(c) definition of hearsay as statements introduced for the truth of the matter asserted.[1] *See United States v. Fried,* 576 F.2d 787, 793 (9th Cir.), *cert. denied,* 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978); *see also Anderson v. United States,* 417 U.S. 211, 219–20, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974). The taxicab trip records, the taxi driver's testimony that he had driven Pearl to Silverman's house on the third visit, Willard's

testimony of a resemblance between Silverman and the man who drove Pearl to the airport, and Silverman's evasions with the DEA agents who visited his home constitute other non-hearsay evidence.

Silverman also questions the quantum of independent evidence required to establish a *prima facie* case of his connection to the conspiracy. The connection is an essential factor for the foundation for admission of the hearsay evidence. "To demonstrate a meeting of minds, one of them must be shown to be [the defendant's]." *United States v. Peterson,* 549 F.2d 654, 658 (9th Cir.1977). *See United States v. Nixon,* 418 U.S. 683, 701 & n. 14, 94 S.Ct. 3090, 3104 & n. 14, 41 L.Ed.2d 1039 (1974); *Glasser v. United States,* 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). *See generally United States v. Federico,* 658 F.2d 1337, 1344–49 (9th Cir.1981) (Alarcon, J., dissenting) (discussing the development of the standard). The trial judge found that the evidence met both the standard of "slight evidence"[2] of a connection and "substantial evidence of a slight connection." On appeal, the government asserts that "slight evidence" of the connection is

---

1. Even if these two statements were considered hearsay, they would be admissible under FRE 803(3), the exception for statements of then-existing state of mind. *See* Fed.R.Evid. 803(3) (exception covers "a statement of the declarant's then existing state of mind ... (such as intent, plan, motive, [or] design ...)"); *United States v. Diez,* 515 F.2d 892, 895–96 n. 2 (5th Cir.1975) (applying rule in context of co-conspirator statement), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976). *See also Wibye v. United States,* 87 F.Supp. 830, 832 (N.D. Cal.1949) (statement of declarant's travel plans admissible to show "design or intent to perform a specific act"), *aff'd,* 191 F.2d 181 (9th Cir. 1951). Here, Pearl's statement demonstrates her plan and intention to call her brother, and could be properly admitted for that purpose. Pearl's plan is clearly relevant to the issue of whether a conspiracy existed between her and Silverman, the key issue in this case. *See United States v. Ponticelli,* 622 F.2d 985, 991 (9th Cir.) (to be admissible, "[t]he state of mind declaration must be relevant to some issue in the case"), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980).

2. The origin of the "slight evidence" term can be traced as follows. *Tomplain v. United States,* 42

F.2d 203, 205 (5th Cir.) ("evidence [of a conspiracy], though slight, was sufficient to show [a] prima facic [case]"), *cert. denied,* 282 U.S. 886, 51 S.Ct. 89, 75 L.Ed. 781 (1930); *Galatas v. United States,* 80 F.2d 15, 24 (8th Cir.1935) ("slight evidence ... may still be substantial, and if so, sufficient"), *cert. denied,* 297 U.S. 711, 56 S.Ct. 574, 80 L.Ed. 998 (1936); *Meyers v. United States,* 94 F.2d 433, 434 (6th Cir.) ("The jury having found guilt, slight evidence connecting a defendant with a conspiracy may be substantial and, if it is, is sufficient"), *cert. denied,* 304 U.S. 583, 58 S.Ct. 1059, 82 L.Ed. 1545 (1938); *Phelps v. United States,* 160 F.2d 858, 867–68 (8th Cir.1947) ("an individual defendant's participation in an established conspiracy [may] become substantial [from the weight and context of the evidence], though in abstraction [it] may seem only slight"), *cert. denied,* 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed.2d 1780 (1948). Relying on *Meyers* and *Phelps,* the Ninth Circuit referred to "slight evidence" while applying the "substantial" evidence requirement. *Nye & Nissen v. United States,* 168 F.2d 846, 852–53 (9th Cir. 1948) (evidence was sufficient of defendant's aiding and abetting crime so issue of sufficient evidence of conspiracy connection need not be reached), *aff'd on other grounds,* 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949).

**1198**

sufficient while Silverman argues that "substantial evidence" is required.

■ The confusion over the correct formulation of the connection evidence has been engendered by cases in this Circuit.[3] We have made clear, however, that the evidence required is "substantial evidence" of a "slight connection." *United States v. Rabb*, 752 F.2d 1320, 1325 (9th Cir.1984); *United States v. Perez*, 658 F.2d 654, 658 (9th Cir.1981). The Supreme Court's most recent statement on the issue appears to require "substantial, independent evidence" of the connection as well as of the conspiracy. *United States v. Nixon*, 418 U.S. 683, 701 & n. 14, 94 S.Ct. 3090, 3104 & n. 4, 41 L.Ed.2d 1039 (1974). The standard clearly calls for the government to make an offer of proof containing sufficient independent evidence of Silverman's connection to the conspiracy to constitute a *prima facie* case of the connection. *See Perez*, 658 F.2d at 658; *United States v. Freie*, 545 F.2d at 1222. The requirement of a substantial amount of circumstantial evidence seems appropriate under *Nixon*, 418 U.S. at 701 n. 14, 94 S.Ct. at 3104 & n. 14, and the initial rationale of the "but slight" requirement of evidence.[4]

■ The independent proof offered of Silverman's connection consists completely of circumstantial evidence. Several inferences can be drawn from this evidence, however. First, we infer that the sister visited her brother on each trip. Such visits could betoken close family ties, but the circumstances—that her first priority, upon arriving in the city for stays of several hours to obtain cocaine, was consistently to visit him—support an inference otherwise. When a man resembling Silverman drove Pearl to the airport after a cab had dropped her at his address, and waited while she delivered cocaine, inferences that Silverman was present at the scene and aware of her transfer of the cocaine are reasonable. The false identity evidence constitutes evidence of Silverman's consciousness of guilt of some crime, which is circumstantial evidence for his connection to this conspiracy.

The trial judge must also have found that Silverman knew of his involvement in the conspiracy. *Cf. Miller v. United States*, 382 F.2d 583, 587 (9th Cir.1967) (failure to establish essential element of knowledge), *cert. denied*, 390 U.S. 984, 88 S.Ct. 1108, 19 L.Ed.2d 1285 (1968). If the inference that he aided his sister in obtaining cocaine upon each visit to Los Angeles

---

3. *Compare United States v. Federico*, 658 F.2d 1337, 1342 (9th Cir.1981) ("slight evidence"); *United States v. Fleishman*, 684 F.2d 1329, 1338 (9th Cir.) (same), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982) *with United States v. Zemek*, 634 F.2d 1159, 1170 (9th Cir. 1980) ("sufficient, substantial evidence"), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 *and* 450 U.S. 985, 101 S.Ct. 1525, 67 L.Ed.2d 821 *and* 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981); *United States v. Weiner*, 578 F.2d 757, 768 (9th Cir.) (per curiam), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978) (same); *United States v. Peterson*, 549 F.2d 654, 658 (9th Cir.1977) ("substantial, independent evidence"). *See also United States v. Dixon*, 562 F.2d 1138, 1141 (9th Cir.1977) ("the substantiality of the independent evidence . . . need only be slight"), *cert. denied*, 435 U.S. 927, 98 S.Ct. 1494, 55 L.Ed.2d 521 (1978).

4. The origins of the "slight evidence" phrase indicate that the term initially referred to circumstantial evidence which amounts to substantial evidence, rather than indicating a low standard for the weight of evidence on the issue. *See Phelps v. United States*, 160 F.2d 858, 862–63 (8th Cir.1947), *cert. denied*, 334 U.S. 860, 68 S.Ct.

1525, 92 L.Ed. 1780 (1948). As the *Phelps* court explained, "[i]t is therefore possible for the circumstances on an individual defendant's participation in an established conspiracy to become substantial from their weight in position and context, though in abstraction they may seem only slight." *Id.* at 867–68. A partial quotation of *Phelps* was the basis for the Ninth Circuit's adoption of language that substantial evidence is required of the existence of a conspiracy, while slight evidence of a defendant's connection to the conspiracy is sufficient. *See Nye & Nissen v. United States*, 168 F.2d 846, 852–53 (9th Cir.1948) (slight evidence is sufficient), *aff'd on other grounds*, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949). The *Nye & Nissen* court properly applied the "substantial amount of slight evidence" test, however, but quoted only the "slight evidence" portion of the test. 168 F.2d at 852–53. This then became one formulation of the Ninth Circuit rule. *See, e.g., United States v. Fleishman*, 684 F.2d 1329, 1338 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *United States v. Knight*, 416 F.2d 1181, 1184 (9th Cir.1969).

is reasonable, taken together with the inference that he was present at the scene of one transfer and the inference of his consciousness of guilt, the trial judge could infer Silverman's knowledge. *See Miranda-Uriarte*, 649 F.2d at 1352–53; *United States v. Federico*, 658 F.2d 1337, 1343 (9th Cir.1981). Therefore, we conclude that the government produced sufficient independent evidence of Silverman's involvement to establish a *prima facie* case of his connection to the conspiracy. The "connection" prong of the foundation for the co-conspirator hearsay evidence is thus satisfied.

*B. Whether the hearsay statements were made "during" and "in furtherance of" the conspiracy.*

■■■ Silverman also contends that two further elements of the foundation for admission of the hearing statements were not satisfied. The trial judge determined that the two hearsay statements challenged—first, that Silverman was the source of cocaine for the conspiracy and second, the reassurance that Silverman would not mind a delay in payment—were made during the course of and in furtherance of the goals of the conspiracy. Silverman contends that we should review the "in furtherance" finding *de novo*. We disagree. We defer to trial court decisions for findings that statements were made "during the course of" and "in furtherance of" the conspiracy, though the exact standard of review on those issues has not been elucidated. *See United States v. Tille*, 729 F.2d 615, 620 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 156, 83 L.Ed.2d 93 *and* —— U.S. ——, 105 S.Ct. 164, 83 L.Ed.2d 100 (1984); *United States v. Whitten*, 706 F.2d 1000, 1018 (9th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *United States v. DeLuca*, 692 F.2d 1277, 1284 (9th Cir.1982); *United States v. Sandoval-Villalvazo*, 620 F.2d 744, 747 (9th Cir.1980).

The clearly erroneous standard appears appropriate because the questions whether the statements were made during and in furtherance of the conspiracy are threshold findings of fact. Thus, the trial judge's conclusion must be affirmed unless it is clearly erroneous. *See United States v. McConney*, 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). A "definite and firm conviction of mistake" does not arise from review of this record.

The first statement was clearly made during the pendency of the conspiracy. Silverman challenges the trial judge's conclusion that the identity of the source was information intended to reassure Willard, in furtherance of the conspiracy, rather than conversational or narrative comment. *See Layton*, 720 F.2d at 556–57. Statements intended to reassure customers on sources of supply can be in furtherance of a conspiracy. *See, e.g., United States v. Mason*, 658 F.2d 1263, 1270 (9th Cir.1981). The district judge's finding that this statement furthered the conspiracy's objectives is not clearly erroneous.

The second statement was elicited by Willard after he had left the conspiracy, but the trial judge found that Pearl and Silverman were still continuing in the conspiracy. The trial judge's finding that this statement was in furtherance of a *continuing* conspiracy is also supported by cases holding that payment is crucial to a conspiracy and furthers its objectives. *See Testa*, 548 F.2d at 855. This finding was not clearly erroneous. Thus, we conclude that an adequate foundation existed for the admission of the hearsay evidence against Silverman. The government established a *prima facie* case, independent of the hearsay evidence, of Silverman's connection to the conspiracy, and the district court's conclusion that the statements were made during and in furtherance of the conspiracy were not clearly erroneous.

*II. Flight jury instruction*

■■■ Silverman challenges a jury instruction regarding his evasive behavior toward the DEA agents and his attempt to "conceal himself" by giving an alias. Giving a false identity is admissible as evi-

dence of consciousness of guilt. *United States v. Birges*, 723 F.2d 666, 672 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 1926, 80 L.Ed.2d 472 *and* —— U.S. ——, 105 S.Ct. 200, 83 L.Ed.2d 131 (1984). Shortly after the officers paid the second visit to his home, his counsel contacted the police. Silverman turned himself in two days later pursuant to an agreement between his counsel and the police, and did not attempt to flee. *See United States v. Myers*, 550 F.2d 1036, 1051 (5th Cir.1977); *Morris v. United States*, 326 F.2d 192, 195 (9th Cir. 1963). *See also Wong Sun v. United States*, 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 415 n. 10, 9 L.Ed.2d 441 (1963).

We review the challenged jury instruction in the context of the whole trial and within the jury instructions as a whole. *United States v. James*, 576 F.2d 223, 226–27 (9th Cir.1978). The instruction was not improper in the context of the trial as a whole. We have recently re-emphasized our preference toward allowing "flight" evidence to get to the jury, who will then determine its probative value in light of the circumstances. *See United States v. Tille*, 729 F.2d at 622. The district court judge acted properly doing so in this case.

CONCLUSION

The foundation for admission of the hearsay evidence was sufficient under FRE 801(d)(2)(E). The flight jury instruction was also proper. The conviction is affirmed.

AFFIRMED.

ALARCON, Circuit Judge, dissenting:

I respectfully dissent.

The majority has affirmed the conviction of David Silverman for conspiracy to distribute cocaine, possession with intent to distribute cocaine, aiding and abetting, and interstate travel in aid of racketeering based on evidence (1) that on three occasions David Silverman's sister may have visited his home in the San Fernando Valley, (2) that David Silverman "looks like" the person who drove her to the Van Nuys Airport, (3) that David Silverman misrepresented his identity to the police shortly before he made arrangements to surrender himself voluntarily, and (4) that an accomplice testified that David Silverman's sister told him that her brother David Silverman was her source. No one testified that David Silverman had any cocaine in his possession or that he was observed aiding or abetting the commission of any crime. No witness testified that he heard David Silverman speak any words or commit any act indicating that he agreed to participate in the alleged conspiracy, nor did any person observe him do anything illegal.

The critical issue in this case is whether the government presented sufficient evidence that David Silverman was connected with a conspiracy and that he knowingly participated with the intent to join and to cooperate in the illegal agreement. I am compelled to dissent because the evidence, independent of the statements of a co-conspirator, was legally insufficient to show that David Silverman was a member of any conspiracy.

My view of the record in this case differs from that of my colleagues. For that reason, I have set forth below extensive quotations from the reporter's transcript to demonstrate the lack of legally sufficient evidence of a slight connection of the defendant to the conspiracy.

I

PERTINENT FACTS AND
PROCEDURE

A. *Motion In Limine*

The issue of the insufficiency of the evidence to connect David Silverman to the conspiracy charged in the indictment was first presented to the trial court prior to trial. On September 29, 1983, David Silverman filed a document with the court containing the caption "Notice of Motion and Motion For Pre-Trial Evidentiary Hearing To Establish Admissibility Of Coconspirator Hearsay Statements And Motion To Exclude Third-Party Declarations: Memorandum of Points and Authorities; Affidavit of Bruce M. Kaufman." In his motion,

David Silverman asserted that a pretrial evidentiary hearing "would eliminate any possibility of the jury impermissibly relying on hearsay statements to establish independent proof of the conspiracy and the defendant's connection to it." David Silverman also alleged that "the only independent evidence linking Silverman to the alleged conspiracy is Silverman's mere association with his sister, codefendant Pearl Phoenix, and a single alleged observation by the government informant of Silverman driving his sister to the airport prior to their departure." Finally, the defendant stated that if allowed to present evidence at a pretrial hearing, he could demonstrate that the extrajudicial declarations of the alleged co-conspirators could not be introduced against him because "there is insufficient evidence as a matter of law to connect him with the charged conspiracy." Thus, the district court was made aware prior to trial that David Silverman objected to the introduction of any extrajudicial declarations because "any statements made by any alleged conspirator cannot be received against defendant Silverman at his upcoming trial and must be excluded" due to the fact that the government "will be unable to establish David Silverman's membership in that conspiracy."

The government opposed the request for a pretrial hearing to determine the admissibility of the co-conspirator statements "in the interest of judicial economy." The district court denied the motion "without prejudice to object to the admission of such evidence at the time of trial *or to move to strike same.*" (emphasis added).

B. *Extrajudicial Statements Offered Against David Silverman*

The testimony of the accomplice David Willard (Willard) clearly established the existence of a conspiracy between the witness and Pearl Phoenix beginning in the fall of 1979 involving the sale of cocaine. The government did not attempt to connect David Silverman by independent evidence to any illegal conduct that may have occurred prior to May 13, 1983.

Willard testified that he flew to the Van Nuys airport with Pearl Phoenix on three occasions in 1983. The first flight was on May 13, 1983. After the plane landed, Willard called a cab for Pearl Phoenix. Willard testified as follows concerning Pearl Phoenix's conduct or statements on this date:

Q. And you called a cab for her?

A. I called a cab for her and she went outside to a pay phone and at which time—

Q. Why did she go to a pay phone?

A. She told me she was going to call somebody.

Q. Did she tell you who she was going to call?

A. Yes, she did.

Q. Who?

A. Her brother.

No objection was made to this testimony concerning the extrajudicial statement of a co-conspirator. The record does reveal, however, that Pearl Phoenix has another brother, Frank Silverman, who also lives in the West San Fernando Valley. The majority states that "[s]ince the defense did not object to [this] statement it was admitted for the truth of the matter asserted." The district court did not so rule. Even if we assume that this evidence was offered for the truth of the matter asserted, it proved no more than that she intended to call one of her brothers. It did not connect either to the commission of any crime.

Furthermore, the majority has overlooked the fact that when the government rested its case in chief, David Silverman's lawyer made a motion "to strike the testimony as it relates to the co-conspirator's statements having been previously introduced by the Court on the grounds that the government has failed to lay the foundation required by the Court." The motion to strike was denied. The procedure followed by counsel complied precisely with the court's order, in denying the motion in limine, that counsel could object at the time of trial *or* move to strike testimony concerning extrajudicial statements on the ground that the government had failed to

connect the defendant to the conspiracy by independent evidence. *See United States v. Reed*, 726 F.2d 570, 580 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984); *United States v. Watkins*, 600 F.2d 201, 204 (9th Cir.) (the trial judge may admit the challenged statements subject to a later motion to strike if the prosecution fails to establish the required foundation), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).

In ruling on the motion to strike, the district court was required to determine if there was evidence connecting David Silverman to the conspiracy independent of the extrajudicial statements of any co-conspirator. Instead, the court determined that it could consider as independent evidence the co-conspirator's statement made on May 13, 1983 because it was not objected to, and the May 31 and the June 17, 1983 co-conspirators' statements because they were apparently received as "basically explaining what the *witness* did." (Emphasis added). Both conclusions are erroneous. As noted above, the trial court had previously ruled that an objection to statements of co-conspirators was not necessary if counsel made a motion to strike on the ground that the accused had not been connected to the conspiracy. I know of no rule, and the majority has cited none, that provides that co-conspirators' statements can be considered as independent evidence connecting an accused to the crime to satisfy the foundational requirements for the admission of co-conspirators' statements.

The trial judge and my colleagues have apparently concluded that a co-conspirator's statements can become "non-hearsay" evidence by simply changing labels and holding that the testimony was not offered for the truth of the matter asserted. Regardless of the theory of admissibility, the law is quite clear that a co-conspirator's statement cannot be admitted into evidence until connection of the accused to the conspiracy has been shown by evidence independent of a co-conspirator's statement. The majority, without discussion, has quietly created an exception to the requirement of independent proof which effectively abolishes the rule.

Because counsel moved to strike the testimony of the witness concerning the May 13, 1983 extrajudicial statement of a co-conspirator, an objection was not required to prevent the use of this evidence for the truth of the matter asserted or to connect David Silverman to the conspiracy. The majority's conclusion that the May 13, 1983 extrajudicial statement formed part of the "non-hearsay" independent evidence is contrary to the rules of evidence and reflects a misperception of the record and the procedure adopted by the trial court for the trial of this matter.

Willard and Pearl Phoenix flew to the Van Nuys airport again on May 31, 1983. Willard again telephoned the Valley Cab Company to obtain a taxi for Pearl Phoenix. The transcript contains the following testimony concerning this event:

Q. When you first got there what did you do, what did Bob Zeitziff do?

A. He went to take care of the plane.

Q. What did you do?

A. I went to call the cab.

Q. What did Pearl do?

A. She went to the pay phone.

Q. What did she do?

A. She called somebody.

Q. Who did she call?

A. Said her brother.

MR. KAUFMAN: Objection.

THE COURT: What is the basis of the objection, please?

MR. KAUFMAN: It's hearsay. Also calls for a conclusion of this witness.

MR. SULLIVAN [government counsel]: Your Honor, I submit its not hearsay. He's basically explaining what the witness did.

THE COURT: All right, the objection will be overruled.

The court erred in overruling the objection. The question: "Who did she call," clearly called for a conclusion. The witness' cryptic answer "Said her brother" was non-responsive and volunteered hearsay testimony. The majority points to this

testimony as part of the "non-hearsay evidence of Silverman's involvement in the conspiracy." Thus, while we are told that this statement was not offered for the truth of the matter asserted, the majority believes that this "non-hearsay" statement by Pearl Phoenix proves that David Silverman was a member of the conspiracy. We are asked to conclude that when a narcotics trafficker tells a co-conspirator that she had called her brother, this extrajudicial declaration, standing alone, is proof, independent of any co-conspirator's declaration, that her brother is a member of a conspiracy trafficking in cocaine. The majority does not attempt to explain the logic of this extraordinary proposition.

I would hold that this co-conspirator's statement cannot be construed as evidence independent of a conspirator's statement to connect David Silverman to the conspiracy. The government's argument that this co-conspirator's statement was not hearsay, but merely an explanation of "what the witness did," also defies critical analysis. If the extrajudicial statement was admitted solely to show that Pearl Phoenix made the statement to Willard and not for its truth as the majority states, how can the statement be used to prove that David Silverman was a co-conspirator? If we can use this statement as independent proof that David Silverman was connected to the conspiracy, we must first accept the truth of the extrajudicial declaration that Pearl Phoenix called her brother and then infer from that fact that he must be her supplier of cocaine.

The syllogism apparently adopted by my colleagues is as follows:

Pearl Phoenix went to Van Nuys to obtain cocaine.

Pearl Phoenix told Willard she telephoned her brother.

Therefore, her brother supplied her with cocaine. I cannot subscribe to this sophistic reasoning.

Pearl Phoenix and Willard returned to the Van Nuys airport on June 17, 1983. Willard testified that upon landing they followed the "same procedure." The record contains the following testimony:

Q. Where did you go?

A. I went to call a cab.

Q. Same cab company?

A. Same cab company and Mrs. Phoenix went to make a phone call.

Q. Did she tell you who she called?

A. Yes, sir.

Q. Who?

A. Her brother.

MR. KAUFMAN: Objection, Your Honor.

THE COURT: All right, is that on the same ground as previously?

MR. KAUFMAN: Yes, Your Honor.

THE COURT: Objection will be overruled on the same basis as previously.

It should be noted that the court did not articulate the basis for its previous ruling (*see* quoted portion of the transcript concerning the May 31, 1983 extrajudicial statement set forth above). We can conclude, however, that the court adopted the basis previously articulated by the prosecutor, i.e. that Willard was "basically explaining what the witness did."

Immediately following the proceedings set forth above, the transcript reflects the following testimony:

Q. Did she tell you her brother's name?

A. Yes, sir.

Q. What was it?

A. David.

Q. Did she tell you his last name?

A. Silverman.

Q. Did she leave in the cab?

A. Excuse me, she didn't tell me she called David Silverman at that time. I knew the name was Silverman from before.

Thus, an examination of the reporter's transcript demonstrates that in none of the extrajudicial statements attributed to her by Willard did Pearl Phoenix state that she was going to or that she had called her brother, *David.* If we were to adopt the reasoning of my colleagues, we could say with equal certitude that she called her

brother, Frank Silverman, and that he is therefore connected to the conspiracy as Pearl Phoenix's supplier of cocaine. This inference, of course, is as fallacious as is the conclusion that David Silverman is connected to the conspiracy because he is also "her brother."

Willard was arrested on his return to Stead Airport on June 17, 1983. He agreed to cooperate with the government in exchange for the government's promise that if he would plead guilty to conspiracy, a motion would be made to dismiss the remaining charges in the indictment returned by the grand jury. As part of his bargain with the government, Willard agreed to record conversations with Pearl Phoenix and her husband, David Phoenix.

The government introduced a tape recording of a telephone conversation between Willard and Pearl Phoenix that occurred on July 12, 1983. Mr. Kaufman, David Silverman's attorney, objected to the admission of this tape recording on the ground inter alia that it contained the statements of a co-conspirator. After listening to argument of counsel at sidebar, the district court stated: "All right, we'll admit it." The court did not state the basis for its ruling.

A tape recording was also made of an August 1, 1983 conversation between Willard and Pearl Phoenix. Mr. Kaufman objected to the admission of this tape as well. The court overruled the objection without explanation. During this conversation, Willard asked Pearl Phoenix "Is your brother cool." The court indicated that this statement was admissible as "co-conspirators' statements."

Following the playing of these recordings, government counsel asked Willard whether Pearl or David Phoenix had told him prior to May 13, 1983, the name of their supplier of cocaine. Mr. Kaufman objected to this question. The court then heard argument on the objection outside the presence of the jury. Mr. Kaufman again argued that the government had not satisfied its "foundational requirements." The court overruled the objection stating

that it was "a fairly close, tough question for the court to tackle but nevertheless I think that it does meet the test of 801(d)(2)(E) and so I'm going to permit the question to be answered." The court did not at this time discuss the evidence that it believed met the requirement of proof of facts of any co-conspirator's statement to establish David Silverman's connection to the conspiracy.

Following the court's ruling, Willard testified as follows:

Pearl Phoenix. I'm not exactly clear on the dates when she told me, but it was in Floriston at their house, the Phoenixes' house and she explained to me that David Silverman had essentially acquired the cocaine business and that was where she was getting the coke from.

This highly prejudicial co-conspirator's statement was not admissible, as will be developed further in this dissenting opinion, because the government failed to present any legally sufficient independent evidence connecting David Silverman to the conspiracy.

### C. Evidence of Pearl Phoenix's Cab Rides

In an attempt to connect David Silverman to the conspiracy, the government offered evidence of cab rides taken by Pearl Phoenix following each of her flights to the Van Nuys Airport. The majority states that on May 13, 1983 and May 31, 1983, Pearl Phoenix was taken to two locations "near" or "close" to David Silverman's residence. The transcript of the testimony does not support the majority's conclusion that Pearl Phoenix went to a location in close proximity to David Silverman's home on May 13 or May 31. The general manager of the Valley Cab Company testified that his business records showed that on May 13, 1983, a passenger was taken from the Van Nuys Airport to Ventura and Louise, in Encino, California. The witness stated that this portion of Encino is a commercial area, approximately five miles from the airport.

On May 31, 1983, the cab company's records show that a passenger was dropped off at Winetka and Ventura, a major business area. The witness stated that the distance between the intersection of Louise and Ventura and Winetka and Ventura is approximately six or seven miles.

On June 25, 1983, Valley Cab Company's business records show a trip from the Van Nuys Airport to 22601 Waterbury. Other evidence established that David Silverman resides at 22601 Waterbury, Woodland Hills, California.

The majority has concluded that this evidence that Pearl Phoenix took a cab to three different locations in the San Fernando Valley—including *one* trip to David Silverman's home—supports an inference that David Silverman was a member of a conspiracy to traffic in cocaine with knowledge of its agreement. The majority does not tell us how we can logically arrive at such a surprising inference. Had Pearl Phoenix visited the San Fernando Mission on each occasion, would this be independent proof that the resident priests are connected to her cocaine activities?

The fact that Pearl Phoenix may have visited her brother is not independent proof of any act on *his* part. These trips lose their innocent nature only if we construe them in light of Pearl Phoenix's statement that her brother David Silverman was her supplier. Basic rules of evidence, however, do not permit us to look to the statements of a co-conspirator until there is independent proof of a connection of the accused to the conspiracy. If Pearl Phoenix had said, prior to a visit to the San Fernando Mission, that a resident priest was her supplier, would the majority believe that her visit to that church was independent proof that the priest was a member of the conspiracy?

The majority appears to apply the following analysis to the evidence concerning the taxi cab trips:

Pearl Phoenix went to the San Fernando Valley three times to obtain cocaine.

Pearl Phoenix visited David Silverman on each trip.

Therefore, David Silverman supplied her with cocaine. This seductive reasoning would make co-conspirators of all relatives who maintain close family ties with narcotics traffickers, without requiring independent evidence of their connection to the conspiracy. This cannot be the law. If it is, then Mr. Bumble's cynical observation about the law may be correct.

### D. *David Silverman's Trip To The Van Nuys Airport*

Willard testified that the driver of the car that drove Pearl Phoenix to the Van Nuys Airport on June 25, 1983, "looked very much like" David Silverman. The majority states that this evidence is sufficient to support a reasonable inference "that Silverman was present at the scene and aware of her transfer of the cocaine." Assuming arguendo that this is a logical inference, it would be insufficient independent evidence to connect Silverman to the conspiracy.

We held in *United States v. Peterson*, 549 F.2d 654 (9th Cir.1977) that "Neither mere association and activity with a co-conspirator nor even knowledge of the conspiracy's existence—not proven here—meets the standards we require to link a defendant to the conspiracy charged. *Id.* at 658. The majority's reliance on mere presence at the scene and awareness of an illegal transaction as sufficient to support an inference of connection to a conspiracy is contrary to the long established law of this circuit.

### E. *David Silverman's Concealment Of His True Identity*

The final evidence relied upon by the majority in support of its conclusion that independent evidence was offered to show Silverman was connected to the Willard-Phoenix conspiracy is his attempt to conceal his identity from the federal agents who questioned him. Without discussion or citation to any authority, the majority concludes that this evidence "constitutes evidence of Silverman's guilt of some

**1206**

crime, which is circumstantial evidence for his connection to this conspiracy."

The federal officers who questioned David Silverman did not advise him that a warrant had been issued charging him with conspiracy with Willard, Pearl Phoenix and David Phoenix to distribute cocaine. No direct or circumstantial evidence was presented by the government to prove that David Silverman had knowledge, prior to the arrival of the officers, that a conspiracy to distribute cocaine existed.

Furthermore, the record shows that David Silverman's evasive conduct was the result of his attempt to avoid arrest until he could call his attorney to arrange for his voluntary surrender. When David Silverman surrendered voluntarily two days later, his cooperation with the government was rewarded with a two-thirds reduction of the amount of the recommended bail. Assuming arguendo that under these unique circumstances, concealment of identity demonstrates at least a temporary consciousness of guilt of something, it does not show that David Silverman had knowledge of the existence of a conspiracy and was a member thereof. I would not convict anyone of conspiracy and three other offenses solely on the basis of a false answer to a request for his identity while the accused was stalling for time to surrender voluntarily.

## II

### CONTROLLING LEGAL PRINCIPLES

A person may not be convicted of conspiracy unless the government proves (1) that a conspiracy existed and (2) that the accused knowingly participated in the conspiracy. *United States v. Friedman*, 593 F.2d 109, 115 (9th Cir.1979). Neither mere presence at the scene of a crime nor association with the alleged conspirators is sufficient to prove that the accused knowingly participated in a conspiracy. *United States v. Weaver*, 594 F.2d 1272, 1274 (9th Cir.1979). *See also United States v. Basurto*, 497 F.2d 781, 793 (9th Cir.1974) ("[m]ere association and activity with a con-

spirator does not meet the test.") Proof that a person had knowledge of the existence of a conspiracy and associated with conspirators is not enough to connect an accused to the conspiracy. *United States v. Basurto*, 497 F.2d at 793. Proof of an accused's connection with a conspiracy must be established before the extrajudicial statements of a conspirator can be introduced into evidence. *United States v. Nixon*, 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 3104 n. 4, 41 L.Ed.2d 1039 (1974); *United States v. Fleishman*, 684 F.2d 1329, 1337 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). The government failed to present any legally admissible independent evidence of *David Silverman's* words or conduct that established that he was a member of any conspiracy. No witness testified that David Silverman committed any illegal act or spoke any words that directly or indirectly connected him to a conspiracy to sell cocaine. Most of the evidence relied upon by the majority to connect David Silverman to the conspiracy consisted of the conspiratorial words and deeds of his sister Pearl Phoenix.

If we exclude the extrajudicial statements made by Pearl Phoenix, the only remaining evidence consists of proof that Pearl Phoenix took a taxi cab ride to her brother's residence on one occasion, that he was at the Van Nuys Airport during the time Willard received cocaine from his sister, and that he gave a false name to federal agents in order to buy time to make arrangements to surrender himself voluntarily. This evidence establishes his association with his sister, his presence at the scene of a cocaine distribution, and perhaps a guilty conscious about something. It does not prove that David Silverman knowingly was a participant in a conspiracy.

The result reached by the majority in this case is a draconian extension of the Common Law doctrine of corruption of blood. Prior to its abolition by Parliament, the law of England provided that the heir of a person convicted of attainder for treason or a felony could not transfer his property to

his heirs because his blood was considered to be corrupted. *Avery v. Everett,* 110 N.Y. 317, 324, 18 N.E. 148, 150 (1888).

"In England, attainders of treason worked corruption of blood and perpetual forfeiture of the estate of the person attainted, to the disinherison of his heirs, or of those who would otherwise be his heirs. Thus innocent children were made to suffer because of the offence of their ancestor." *Wallach v. Van Riswick,* 2 Otto 202, 210, 92 U.S. 202, 210, 23 L.Ed. 473 (1876). In order to preclude this type of injustice in the United States, the drafters of the Federal Constitution provided that "no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted." U.S. Const. art. III, § 3, cl. 2. The effect of today's holding is that if one's sister is guilty of conspiracy, he may also be found guilty of that crime if the evidence shows no more than mere association with his sister and that he concealed his identity to the police shortly before he agreed to surrender voluntarily.

I cannot join in the agreement reached by my colleagues.