**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Santos ACEVEDO, Defendant–Appellant.**

No. 93–1536.

United States Court of Appeals, Seventh Circuit.

Argued March 30, 1994.

Decided July 1, 1994.

Barry R. Elden, Asst. U.S. Atty., Terry Kinney (argued), Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

Richard R. Mottweiler, James A. Graham (argued), Chicago, IL, for Santos Acevedo.

Before BAUER, FLAUM and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

The defendant was convicted of three drug trafficking offenses after attempting to sell one and one-half kilograms of cocaine to an acquaintance-turned-government - informant. His arrest for the failed deal led to a search of an apartment (apparently his) where marijuana, cocaine and drug mixing equipment, among other things, were found. Relying upon the testimony of the informant, the testimony of a DEA drug expert, and physical evidence from the apartment, the district court at sentencing attributed to the defendant eleven kilograms of cocaine in addition to the drugs actually seized. He challenges both this determination and a evidentiary ruling that the district court made during his jury trial.

When arrested the defendant was in possession of a false Illinois driver's license that bore the defendant's photograph, listed a Social Security number of a deceased individual named Santos Acevedo, and was issued in the name of Santos Acevedo. (The government charged the defendant as Santos Acevedo because it was unable to ascertain the defendant's true identity.) This information was presented to the jury. The defendant argues that it constituted evidence of "other wrongs," inadmissible under Fed. R.Evid. 404(b) for its tendency to show that he was a person of bad character and there-

fore more likely to have committed the charged offenses.

■ The possession of false identification by a drug trafficking defendant at the time of the trafficking, however, is not merely generalized evidence of bad character. Rather, by indicating that the defendant wished to conceal his identity during ongoing involvement with drugs, it can help prove an element of the offense charged, namely that the defendant possessed a culpable state of mind. This is a legitimate use of such evidence, whether one conceives of it as outside the scope of Rule 404(b) because of the evidence's "intrinsic" value deriving from its specific relationship to the facts of the offense or as countenanced by Rule 404(b) because of its relevance in proving a non-character-related consequential fact—consciousness of guilt. *See, e.g., United States v. Wilson,* 11 F.3d 346, 353 (2nd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2142, 128 L.Ed.2d 870 (1994); *United States v. Wint,* 974 F.2d 961, 967 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1001, 122 L.Ed.2d 151 (1993); *United States v. Horton,* 873 F.2d 180, 181 (8th Cir.1989); *United States v. Kloock,* 652 F.2d 492, 494–95 (5th Cir. Unit B 1981); *cf. United States v. Silverman,* 771 F.2d 1193, 1199–1200 (9th Cir. 1985), *withdrawn,* 796 F.2d 339 (9th Cir. 1986), *and superseded on other grounds,* 861 F.2d 571 (9th Cir.1988). Either way, the evidence is relevant to the defendant's state of mind entirely apart from how it reflects upon his character (and under current circuit law, the government is entitled to present "other acts" evidence to assist in proving such a material element of an offense even if it is not in dispute, *see United States v. Maholias,* 985 F.2d 869, 879 (7th Cir.1993); *United States v. Chaimson,* 760 F.2d 798, 803–04 (7th Cir.1985)). The district court insured that the evidence was properly so viewed by specifically instructing the jury as to the limited use to which it could be put. We also believe the danger of unfair prejudice arising from the disclosure of the defendant's possession of a false driver's license was slight. It was entirely within the district court's discretion to conclude that the jury would not draw unjustified inferences about the defendant as a drug dealer because of his

willingness to assume the identity of a dead man and would not be so enraged by the nature of the act that it would disregard its mandate to decide the defendant's guilt or innocence only with respect to the offenses charged.

After the defendant was arrested, he consented to a search of an apartment of which he was apparently a resident. (Keys found on the defendant opened the apartment door and a utility bill found in the defendant's car bore the apartment's address). DEA agents found the apartment unoccupied (although loud music was playing inside). The apartment was spartanly furnished but did contain a loaded pistol and two scales (triple-beam and electronic) on a small table in the dining room, a shotgun in the closet, several bags of marijuana in the bedroom, and more drug-related items in the kitchen—specifically, there were two plastic bags containing a total of about 1.7 kilograms of high purity cocaine powder, next to the sink there was a white powder mixture alongside implements for cutting and mixing cocaine, in the trash inside a single bag there were twelve large ziplock plastic bags, of the same type as the bags found containing cocaine, and a green wrapper, all with white powdery residue on them, and around the kitchen there were other, smaller plastic bags. A DEA expert tested the powder inside one of the large bags for the presence of cocaine with positive result and testified that the other large bags smelled of cocaine. He also testified that in his opinion the green wrapper also contained cocaine residue and both it and the large ziplock bags were used, at one point or another, for storing or transporting kilogram quantities of cocaine. He stated that a red wrapper found next to one of the bags of cocaine was, like the green wrapper, used to package cocaine before it was cut. The agent opined that the apartment was used as a cocaine distribution hub and based on the packaging materials found concluded that at least fifteen kilograms of cocaine had passed through it.

The government also offered the testimony of the informant in support of its argument that at least fifteen kilograms of cocaine should be attributed to the defendant. The

informant testified that he had had an ongoing drug-buying relationship with the defendant and in the course of that relationship had purchased from the defendant, or discussed the defendant's receipt of, very large quantities of cocaine, forty and forty-five kilograms on two occasions. The district court refused to fully credit the testimony of the informant (who was receiving favorable treatment from the government in exchange for his cooperation) because he had a long record of deceit, including lying to agents earlier in this investigation about the extent to which the defendant was the source of a separate eight kilogram delivery. However, the court did rely on the informant's testimony in combination with other evidence in the case, especially the content and tone of a recorded conversation between him and the defendant, to conclude that a drug-related relationship did exist. The court turned to the physical evidence from the apartment to ascertain the extent of the relationship and only accepted the informant's statements of amount to the extent they were so corroborated. Noting the sophisticated drug distribution equipment at the apartment and finding the testimony of the DEA agent credible, the court determined that the plastic baggies indicated by their size and the presence of cocaine residue that at least eleven additional kilograms of cocaine went through the apartment, and the court considered such to be relevant conduct under U.S.S.G. § 1B1.3. The defendant was accordingly sentenced.

■ The defendant asserts that the district court's conclusions were clearly erroneous, *United States v. Montgomery,* 14 F.3d 1189, 1196 (7th Cir.1994); *United States v. Sykes,* 7 F.3d 1331, 1335 (7th Cir.1993); *United States v. Rivera,* 6 F.3d 431, 444 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1098, 127 L.Ed.2d 411 (1994), in two respects: first, because they relied to some extent on the testimony of the untrustworthy informant and, second, because they were, at the end of the day, conjectural. The informant was indeed of dubious credibility. The district court recognized as much and thus placed no faith in those parts of his testimony that were not independently corroborated. This was entirely within its discretion to do, *see, e.g., United States v. Cedano–Rojas,* 999

F.2d 1175, 1180 (7th Cir.1993); *United States v. Soria,* 965 F.2d 436, 443 (7th Cir.1992), and our analysis must turn to whether the evidence as a whole supported the attribution to the defendant of the cocaine from the apartment, especially the eleven kilograms of cocaine not found but presumed to have been processed and distributed by the defendant's operation out of the apartment.

■ First of all, the defendant asserts that there was not sufficient evidence to link him to the goings-on in the apartment, mostly because the only fingerprints found in the apartment were those of another man. However, the keys to the apartment found in the defendant's possession, the receipts in his name found in the apartment, including the receipt to the pager that he used in arranging the set-up cocaine sale to the informant, as well as the presence in the apartment of undeveloped photographs of the defendant, the fact that an apartment employee collected rent from the defendant and that the defendant himself implied his role in ongoing distribution activity when negotiating with the informant, amply indicate the defendant's connection to the apartment and to the sophisticated and open drug operation being carried out there. And because the defendant does not otherwise argue that there was insufficient evidence to support the conclusion that drugs distributed from the apartment "were part of the same course of conduct or common scheme or plan as the offense of conviction," U.S.S.G. § 1B1.3(a)(2); *see also United States v. Mumford,* 25 F.3d 461, 465 (7th Cir.1994), he is accountable for the amount of cocaine that can fairly be associated with that distribution operation.

■ The district court was right to attempt to estimate the quantity of cocaine that actually went through the apartment as part of this single drug operation beyond the amount · that was actually seized. *See* U.S.S.G. § 2D1.1, application note 12. The defendant challenges that estimate as speculative, or, in other words, clearly not supported by a preponderance of the evidence. The district court arrived at a more conservative figure than the one the government and its expert witness advanced, eleven addi-

tional kilograms instead of fifteen (and an additional twenty that the government urged the defendant had previously sold to the informant). The court accepted that the large kilogram bags containing cocaine residue (according to the testimony of the DEA expert which, since based on his personal inspection, the court undoubtedly could credit) probably each held separate kilogram quantities of cocaine at one time. The court did not attribute additional kilograms based on the red and green wrappers and the many smaller baggies found in the apartment as the government had asked.

We are not persuaded that the district court's estimate was too speculative to be sustained. It was clear that the apartment served as a center for distributing large amounts of cocaine and that more than the 1.7 kilograms that were actually found at the time of the search were processed for distribution on the site. To arrive at a figure that would reflect the true scope of the operation the district court utilized a measurement that was objectively based and unlikely to result in double counting. The large baggies were kilogram capacity and, given the use to which like bags were actually put and the presence of cocaine residue, the conclusion that they were largely filled at one time was sound. Furthermore, the district court did not unthinkingly add up the total volume of all cocaine-related containers found in the apartment; rather, it excluded those which could have held the same cocaine in different stages of processing: the wrappers were conceivably used for importation and the smaller baggies for individual sales and their capacities were not factored into the calculus. On the other hand, no reason was offered why cut cocaine would be poured from one large bag into another and, especially in light of the availability of numerous smaller bags, the testimony of the DEA expert that they likely held their own respective quantities of cocaine on the order of a kilogram could be credited. Estimating the amount of drugs that went through an ongoing operation on the basis of a snapshot of that operation is inherently an inexact science but is one in which the district courts must be engaged. The district court here recognized the caution with which the task must be approached and took pains to err on the side of underestimation. There was no clear error. The conviction and sentence are affirmed.