96 F.3d 1450
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
MONTIE L. RUSSELL, MICHAEL GILLESPIE, DEXTER HAMMOND, and
RANDY HORTON, Defendants-Appellants.
 No. 94-4000, 94-4013, 95-1036 and 95-1087.
 United States Court of Appeals, Seventh Circuit.
 Argued April 11, 1996.
Decided Aug. 30, 1996.
As Amended on Denial of Rehearing Dec. 20, 1996.
 
 Before BAUER, CUDAHY, and EVANS, Circuit Judges.
 
 ORDER
 
 1
 Montie Russell, Michael Gillespie, Dexter Hammond, and Randy Horton participated in an extensive and relatively well-organized conspiracy to sell crack cocaine in Rockford, Illinois. According to witness testimony, the conspiracy was orchestrated and controlled by a small group of individuals, sometimes called "the Mob." The Mob collaborated to purchase powder cocaine, converting some of it to crack, and it made collective decisions about who would sell the crack and powder cocaine and where they would be sold. It also employed a group of subordinates, called "runners" and "workers," who acted upon its decisions. The Mob divided the lion's share of profits from drug sales. The membership of the Mob was somewhat fluid, but, at one time or another, it included Russell, Gillespie, and Horton. Hammond was one of the subordinates. We discuss the facts of the conspiracy more fully in a published opinion in a separate case, United States v. Evans, Nos. 94-3633, 94-3727, 94-3690, 95-3112 & 94-3691, (7th Cir. August 9, 1996).
 
 
 2
 In 1993, a grand jury indicted these four and fifteen others on various drug and gun charges. The district court conducted a separate trial for the appellants and one other defendant, Gloria Holmes. Although the jury acquitted Holmes, it convicted all of the appellants on each of the charges brought against them. Russell, Hammond, and Gillespie now challenge their convictions, and Gillespie, Hammond, and Horton challenge their sentences. We affirm the judgment of the district court in all respects.
 
 
 3
 Hammond argues that the district court erred in denying his pre-trial motion to suppress evidence that he possessed a "street sweeper" shotgun. The court concluded that the evidence had been properly obtained in a warrantless search. This evidence had been important to his conviction and to his sentence, and his argument about the denial of his motion therefore implicates both. According to the Supreme Court's recent opinion in Ornelas v. United States, 116 S.Ct. 1657 (1996), we undertake a de novo review of a district court's decision to admit evidence that is the product of a warrantless search.
 
 
 4
 Officers of the Rockford Police Department discovered Hammond's possession of the shotgun during his arrest. Hammond shared a home with his mother, and the police went there to execute an arrest warrant for him. Hammond's mother let the officers inside, where they encountered Hammond as he climbed the stairs from his basement room. Because he was barefoot, Hammond asked the officers to let him return to his room and get a pair of shoes. While Hammond sat on his bed and put on his shoes, an officer looked through an open closet door a few feet from the bed and saw a black mesh bag bearing a sticker that read "Assault Systems." As other officers were handcuffing Hammond, this officer opened the bag and found the shotgun.
 
 
 5
 The district court ruled that this discovery was legitimate under two exceptions to the warrant requirement: the protective-sweep exception described in Maryland v. Buie, 494 U.S. 325 (1990) and the search-incident-to-arrest exception set forth in Chimel v. California, 395 U.S. 752 (1969). We conclude that the district court correctly decided to admit the evidence that came from this discovery.
 
 
 6
 The officers certainly had the authority to look into the closet and discover the bag itself. The record before us does not clearly show whether the bag was visible from Hammond's bedroom through the open closet door or whether the officer saw it only after entering the closet; but, in either event, the discovery of the bag would be legitimate. If the officers could see the bag without entering the closet, no special exception to the warrant requirement applies. They were legally present in Hammond's bedroom by virtue of the arrest warrant and his consent, and if they could see the bag from the bedroom, it was, of course, in plain view. If one of the officers had to stick his head inside the closet in order to see it, the protective-sweep exception covers such an action. This exception permits officers who are making a legal arrest to search places where people might be hiding. Buie, 494 U.S. at 334. The closet in Hammond's bedroom was certainly such a place. Hammond contends that this exception does not permit them to open containers like the bag, and this is correct. But that is not the purpose for which the exception applies here; in this case, the exception covers the discovery of the bag.
 
 
 7
 Once the officers discovered the bag, they could open it under the search-incident exception. This exception permits officers who are conducting an arrest to open containers within the immediate control of the arrested person. Chimel, 395 U.S. at 763. Hammond argues that the bag was not within his immediate control because it was several feet away from him when the officers discovered it and because he was being handcuffed at the time. We have previously rejected similar arguments based on analogous factual circumstances. United States v. Queen, 847 F.2d 346, 353-54 (7th Cir.1988). Determining whether a container is within an arrestee's immediate control does not turn on an finding that the arrestee could probably reach the container. The exception exists to allow officers to protect themselves from harm while they conduct arrests, and they therefore may search any container that could contain a weapon and that is conceivably accessible to the arrestee--assuming that he has no supernormal powers. Id. at 353. Because the bag in question here fits this description, the evidence found inside was legally obtained and properly admitted.
 
 
 8
 Russell contends that he was denied a fair trial when the district court denied his motion to sever his trial from that of Holmes. We review a district court's ruling on a motion to sever for the abuse of discretion. United States v. Mohammad, 53 F.3d 1426, 1431 (7th Cir.1995). Russell wanted to be tried separately from Holmes because he believed that Holmes' defense to the charges against her prejudiced him because it was mutually antagonistic with Holmes' defense. The government charged Holmes with possession of cocaine with the intent to distribute because a kilogram of cocaine base was found in her bedroom, and Holmes defended herself by testifying that she had not put the cocaine base there herself. She also noted that Russell had been alone in her apartment shortly before the drugs were discovered. It is quite obvious that Holmes' defense was harmful to Russell's case, but this harm does not constitute prejudice. Prejudice arises when the defendant could not have had a fair trial without severance, not when the defendant simply would have had a better chance of acquittal in a severed trial. Zafiro v. United States, 113 S.Ct. 933, 938 (1993). In the context of this case, Holmes' defense would have created prejudice for Russell's if her testimony would have been admissible in her own trial but not in a separate trial for Russell alone. No such prejudice arose here because Holmes' testimony would have been admissible in a trial only for Russell, just as it was in their joint trial. Thus, the evidence against Russell in his own trial would have been essentially the same as the evidence against him in the joint trial. Russell's arguments are similar to the arguments rejected by the Supreme Court in Zafiro, and we reject them here.
 
 
 9
 Gillespie and Hammond challenge their convictions on conspiracy charges by asserting that the evidence against them was insufficient. A court of appeals will only overturn a conviction for want of sufficient evidence if no rational trier of fact could have reached a verdict of conviction on the basis of the evidence considered in the light most favorable to the government. United States v. Blanding, 53 F.3d 773, 777 (7th Cir.1995). In this case, the crucial evidence against Gillespie and Hammond came from the testimony of Donald Box, a member of the conspiracy. Box testified that both Gillespie and Hammond had willingly joined the conspiracy with full knowledge that the conspiracy existed. Gillespie and Hammond each raise similar arguments, insisting that the evidence against them was insufficient because Box's testimony was not credible. We have long held that courts of appeal will not second-guess credibility determinations made by the trier of fact. See United States v. Wilson, 31 F.3d 510, 513 (7th Cir.1994). But Gillespie and Hammond suggest that there is something different about the credibility determination here. They note that, during the sentencing hearing, the district court expressed some doubt about the credibility of some aspects of Box's testimony. This is true enough, but it does not change our approach to credibility determinations. In the first place, Gillespie and Hammond challenge the credibility determination made by the jury, and the determination that it made during the trial is entirely independent of the one made by the judge at sentencing. A credibility determination is not invalid just because a judge and jury do not share it. Indeed, our deference to credibility determinations comes from the recognition that they can be various. Moreover, the judge only expressed doubt about some small parts of Box's testimony, and these parts were not relevant to the elements of the offenses with which Gillespie and Hammond were charged. As a result, the fact that the judge had some very limited doubts about Box's testimony does nothing to help Gillespie and Hammond.
 
 
 10
 In determining their sentences, the district court found that Gillespie and Horton were leaders of an extensive conspiracy. It therefore concluded that their base offense levels should be enhanced by four levels according to § 3B1.1(a) of the guidelines. Gillespie and Horton contend that the evidence available at the sentencing hearing did not prove that they were leaders, and they ask us to order resentencing. We will do so only if the district court's finding was clearly erroneous. United States v. Akinrinade, 61 F.3d 1279, 1288-89 (7th Cir.1994), cert. denied, 116 S.Ct. 541 (1995).
 
 
 11
 Section 3B1.1 of the guidelines is based on the principle that a defendant's culpability increases according to his role in criminal activity. If the defendant performs any role in which he takes responsibility for others involved in his crime, he is subject to an enhancement to his base offense level; thus § 3B1.1(c) provides for a two-level enhancement when the defendant is a leader, organizer, manager or supervisor in any criminal activity. The enhancements increase when the criminal activity involves five or more people, including the defendant, or is otherwise extensive. The leaders or organizers of such extensive crimes receive a four-level enhancement while the managers or supervisors receive a two-level enhancement because they have less responsibility for directing the crime than leaders or organizers do. See § 3B1.1(a) & (b). The application notes to this section of the guidelines describe seven factors for distinguishing leaders and organizers from others involved in the crime. They are: the exercise of decision making authority, the nature of participation in the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning the offense, the scope of the illegal activity and the degree of control and authority over others. § 3B1.1, cmt. n. 4.
 
 
 12
 Gillespie and Horton argue correctly that control over others is a sine qua non of leadership for § 3B1.1(a). To be a leader, a defendant " 'must have some control, direct or indirect, over at least four other participants in the offense.' " United States v. Guyton, 36 F.3d 655, 662 (7th Cir.1994) (quoting United States v. Carson, 9 F.3d 576 (7th Cir.1993)). They point out that, in finding that they were leaders or organizers, the district court did not find that each controlled four people directly. In their view, the district court found that Horton controlled one person and that Gillespie controlled two. They contend that this is insufficient to justify the imposition of the four-level enhancement.
 
 
 13
 Their argument takes to narrow a view of how a leader may exercise control. Governance by committee does not annul the members' leadership. It shares that leadership among the committee's members. In the legitimate, non-criminal world, hierarchies are only sometimes rigid pyramids in which everyone reports to a single boss in the tier above. Quite often, subordinates report to a group. For instance, "[i]ndividual employees of a corporation generally do not report to individual members of the board of directors." Evans, 92 F.3d at 545. A corpporation's employees instead report to the whole board, which serves as "the corporation's collective leadership." Id.
 
 
 14
 Gillespie and Horton demonstrated this collective leadership through their participation in the Mob. In this case, ample testimony at trial revealed that the participants in the Mob made the crucial decisions about how their subordinates would sell crack; they organized a distribution network and planned sales through it. Moreover, witness testimony also revealed that their suboridnates were many in number and that the subordinates' sales were extensive in every way. Finally, the members of the Mob received a larger share of the profits than their subordinates.
 
 
 15
 "The fact that fewer than five members of the peripheral group actually reported to the defendant is immaterial," as Evans held for one of Gillespie's and Horton's fellow Mob directors. Id. The trial evidence was enough to demonstrate that membership in the Mob made a defendant an organizer or leader for the purposes of § 3B1.1(a). All of this was enough to justify the equation of Mob membership with leadership. Because there was also ample evidence that Horton and Gillespie were part of the Mob, the district court did not err in finding that they were leaders.
 
 
 16
 Horton submits one other argument contesting the district court's application of the four-level enhancement to him. Although he admits that substantial credible evidence identified him as a member of the Mob, he insists that he is less culpable than the other members of the control group because he was less powerful than they. Even if Horton were the weakest member of the Mob, the district court's finding that he was a leader would still be justified. It is true that § 3B1.1 recognizes that responsibility is relative; but this recognition does not mean that there are an infinite number of degrees of responsibility. The section effectively recognizes three degrees of responsibility: any major role in any criminal activity, a managerial or supervisory role in an extensive criminal activity and a leading or organizing role in an extensive criminal activity. For the reasons noted above, membership in the Mob itself was commensurate with the highest degree of responsibility recognized by § 3B1.1. Horton crossed the threshold for the highest degree by virtue of his membership in the Mob. The fact that others went farther over that threshold does not prove that Horton himself did not cross it himself. In light of these considerations, the district court did not clearly err in making the findings that justified the four-level enhancements for either Horton or Gillespie.
 
 
 17
 Gillespie and Horton maintain that the district court erred in determining their base offense levels at sentencing because it miscalculated the amount of drugs involved in the conspiracy. The court set their base offense levels at 38. According to § 2D1.1(c) of the sentencing guidelines, this offense level is appropriate when the crime involves more than 1.5 kilograms of cocaine base. The district court made its finding by relying on trial testimony from various witnesses who described how numerous members of the conspiracy had purchased cocaine base and cocaine powder on different occasions; the drugs purchased in these transactions added up to ten kilograms of cocaine powder and ten kilograms of cocaine base. The district court also cited other evidence that corroborated this witness testimony. But the district court did not believe everything that the witnesses said about cocaine purchases. It noted that some witnesses were not entirely credible in their estimations of drug amounts, and it specifically pointed out that the drug amounts reported by Donald Box should be discounted by specific percentages, which were apparently chosen arbitrarily. We review a district court's determination of drug amounts in the same way that we review all of its factual findings at sentencing--for clear error. United States v. Henderson, 58 F.3d 1145, 1151 (7th Cir.1995).
 
 
 18
 Gillespie argues that the district court's findings about the drug amounts were purely speculative, but he simply asserts this characterization and does not explain how it can be justified in light of the district court's obvious devotion to specificity and corroboration. The government's own brief ironically offers a reason for making this characterization and then goes on to refute this reason. The government acknowledges that the district court engaged in a questionable method of factfinding when it made some of its determinations by numerically discounting the drug amounts to which Box testified. In an opinion issued after the sentencing hearing in this case, we noted that this method of factfinding lends itself to speculation and should be avoided. Henderson, 58 F.3d at 1151-52. If the district court had made its findings solely by making arbitrary discounts, Gillespie would have a point. But the district court had plenty of other evidence to justify its findings besides the discounted evidence. This existence of this evidentiary foundation demonstrates that the district court's finding was not clear error. See id.
 
 
 19
 Horton argues that this finding was erroneous as it applied to him. The district court concluded that Horton could reasonably foresee that the conspiracy involved more than 1.5 kilograms of cocaine because he was one of its leaders. Horton does not dispute that a leader of this conspiracy could have this degree of foresight; but he does contend, as we noted above, that he was not a leader. His argument about his base offense level is thus an extension of his argument about the leadership enhancement. We can accept this latter argument only if we agree that the district court clearly erred in finding that he was a leader. Because we do not find an error about his leadership role, we do not find one about his base offense level.
 
 
 20
 Gillespie also presents an additional argument. He contends that the determination of his base offense level is improper because it depends upon a distinction between powder cocaine and crack cocaine; and he argues that this distinction is unconstitutional in light of the principles of due process and equal protection. Gillespie is correct in noting that his base offense level would have been less than 38 if the district court had not distinguished between crack and powder cocaine. But we have recently held that this distinction is not unconstitutional. See United States v. Terrel Scott Booker, 73 F.3d 706, 710 (7th Cir.1996); United States v. Henry Booker, 70 F.3d 488 (7th Cir.1995).
 
 
 21
 The judgment of the district court is AFFIRMED.