**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael HENDERSON and Leroy Nolan, Defendants–Appellants.**

Nos. 94–3324, 94–3325.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1995.

Decided June 20, 1995.

Keith C. Syfert, Scott Verseman (argued), Office of U.S. Atty., Rockford, IL, for plaintiff-appellee U.S.

Kevin E. Milner (argued), Chicago, IL, for defendant-appellant Michael Henderson aka Mickey.

Franklin C. Cook (argued), Freeport, IL, for defendant-appellant Leroy Nolan.

Before POSNER, Chief Judge, FLAUM, Circuit Judge, and SHABAZ, District Judge.*

FLAUM, Circuit Judge.

Defendants Michael Henderson and Leroy Nolan ("Leroy") were convicted of conspiring to distribute cocaine base, distributing cocaine base, and using a firearm in relation to drug trafficking crimes. In this joint appeal, both men challenge their convictions for sufficiency of the evidence. Additionally, Leroy contests the admission of certain evidence, while Henderson disputes the quantity of drugs attributed to him for sentencing purposes and objects to an enhancement he received for obstructing justice. We now affirm the convictions and Henderson's sentence in all respects except that we reverse and remand with regard to the amount of drugs credited to Henderson.

## I.

Henderson and Leroy were indicted, together with Albert Edwards and Terry Wilson, on July 27, 1993, of conspiring to distribute cocaine base, in violation of 21 U.S.C. § 846, and using a firearm during the commission of drug trafficking crimes, in violation of 18 U.S.C. § 924(c). Henderson also was charged with distributing 8 grams of cocaine base on June 29, 1993, in violation of 21 U.S.C. § 841(a)(1). He, Wilson, and Leroy were indicted for distributing 10 grams of cocaine base on June 29, 1993, also in violation of 21 U.S.C. § 841(a)(1). The United States filed a superseding indictment on November 23, 1993, changing only the end date of the conspiracy from July 27, to July 28, 1993.

Henderson and Leroy's joint trial was severed from that of Edwards and Wilson. At Henderson and Leroy's trial, the government called two cooperating witnesses to testify regarding the conspiracy and other charges. Bryant Nolan ("Bryant"), stated that he had sold cocaine base for Henderson since mid–1992. He began by selling $10 bags in Rockford, Illinois, but soon changed his territory to Streator, Illinois. Henderson provided Bryant with packs of cocaine base, each of which contained $300, then $1,000, worth of the drug in smaller bags of $10 or $20 amounts. Eventually, Bryant was selling $1,500 worth of cocaine base per week.

Later, Bryant switched back to Rockford, selling cocaine base for Henderson out of various drug houses run by Henderson. Bryant testified that he spent a considerable amount of time between April 16 and July 28, 1993, at Henderson's Rockford residence at 1019 Irving. He stated that Henderson bought cocaine in kilogram quantities, purchases financed by Henderson, Leroy, Edwards, and another man, Lawrence Jackson.

---

* The Honorable John C. Shabaz, of the United States District Court for the Western District of Wisconsin, sitting by designation.

Bryant asserted that Henderson would "cook" the cocaine and then package the resulting cocaine base, commonly known as crack, in $10 or $20 bags. Bryant testified that Henderson stored large amounts of drugs at the Irving apartment and sometimes sold from that location. Bryant additionally recalled that while involved with the Henderson organization, he and others carried guns and, after an attempted robbery of the Irving location in June, 1993, kept firearms there.

The government also presented the testimony of Melvin Jones ("Melvin"). Melvin stated he had used a variety of drugs between 1987 and 1991, some of which Henderson had supplied. He testified that in 1991, Henderson had begun supplying him with drugs to sell. After being arrested for bank robbery in March, 1993, Melvin started making undercover drug purchases for the government.

On June 28 and 29, 1993, Melvin, in an attempt to purchase cocaine base from Henderson, visited the Irving address eight times while wired with a recording device. On one of those occasions, Henderson, after Melvin asked to purchase an ounce of cocaine base, provided him with 8.2 grams for $700. Henderson told Melvin to return later for the remainder of the requested quantity because someone else was "cooking" it. Henderson indicated that he would not be present later but that someone else would take care of Melvin.

When Melvin returned to the Irving apartment, the cocaine base had not yet been delivered. He waited approximately one-half hour until Leroy appeared. After talking to other conspirators, Leroy left and then shortly returned. He entered the apartment and handed Wilson a bag containing several packages of cocaine base. Melvin and Wilson counted the money for the purchase. Wilson handed Melvin a 10.2 gram package and gave the money to Leroy. Before leaving, Leroy asked Melvin if he was "straight" (interpreted by Melvin to mean satisfied).

On July 6, 1993, pursuant to a state warrant, police searched the Irving location and recovered a loaded .38 caliber pistol, which Bryant identified at trial as Henderson's, a

box of 9 millimeter ammunition, $1,500 in cash, eleven boxes of plastic sandwich baggies, either full, partially full, or empty, and many baggies with their corners cut off. The officers found no drugs on the premises. When arrested on July 28, neither Henderson nor Leroy had any drugs on their persons.

On May 4, 1994, the jury convicted the defendants on all charges against them. The district court sentenced Henderson and Leroy to 360 and 216 months imprisonment, respectively. This appeal followed.

## II.

### A.

Henderson and Leroy both claim that the government presented insufficient evidence with which to convict them of the charges. We will uphold a jury verdict against a defendant if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). This standard places a heavy, although not insurmountable, burden on a defendant challenging the sufficiency of the evidence. *See, e.g., United States v. Theodosopoulos*, 48 F.3d 1438, 1449 (7th Cir.1995); *United States v. Goines*, 988 F.2d 750, 758 (7th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993).

The defendants attack their convictions by arguing that because the government's case rested almost exclusively on the testimony of two completely unbelievable witnesses, Bryant and Melvin, the jury verdicts cannot stand. We have stated before, however, that "questions of credibility are solely for the trier of fact, [so] such arguments are 'wasted on an appellate court.'" *United States v. Marin,* 7 F.3d 679, 688 (7th Cir. 1993) (quoting *United States v. Ruiz,* 932 F.2d 1174, 1178 (7th Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991)), *cert. denied,* — U.S. —, 114 S.Ct. 739, 126 L.Ed.2d 702 (1994). Indeed, we will

uphold a conviction based *solely* on the *uncorroborated* testimony of an accomplice unless his testimony is incredible as a matter of law. *United States v. Wallace*, 32 F.3d 1171, 1173 (7th Cir.1994). Evidence is incredible as a matter of law only when it would have been "'physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.'" *Id.* (quoting *United States v. Wyhe*, 965 F.2d 528, 531 (7th Cir.1992)); *see United States v. Wilson*, 31 F.3d 510, 513 (7th Cir.1994) (We will not re-evaluate the credibility of testimony "even if the evidence is totally uncorroborated and comes from an admitted liar, convicted felon, large-scale drug dealing, paid government informant." (internal quotations omitted)).

Neither defendant demonstrates how Melvin or Bryant's testimony was incredible as a matter of law. Instead, Henderson and Leroy make the precise arguments that we have rejected in the past: the jury could not rationally believe Bryant and Melvin because both men had prior criminal convictions and had received favorable plea agreements for their cooperation with the government. The defendants also present a litany of evidence that calls Bryant and Melvin's testimony into question. They contend that Bryant's testimony was not credible because he had no money to post bail after his arrest, even though he claimed at trial to have sold thousands of dollars worth of drugs, and had thereby turned a handsome profit for himself. They claim that the sentencing court did not believe Bryant's testimony and therefore attributed to the defendants only 10% of the amounts of drugs Bryant testified to selling. They point out that Melvin stole money from the government while working undercover. Melvin admitted he negotiated lower prices with certain drug sellers and kept the excess government money by hiding it behind the dashboard while government agents searched his car. Henderson also suggests that Melvin hid the crack he allegedly bought from Henderson and Leroy behind the dashboard and then turned it over to the government as proof of the transactions between himself and the defendants.

Whatever the effect these attacks on Bryant and Melvin's credibility were intended to have, the jury still chose to believe the government's witnesses. That is the jury's prerogative. And, while the district court had trouble accepting Bryant's testimony about the amounts of drugs he sold, it specifically stated that it believed his testimony as it related to the conspiracy and found that evidence supported the defendants' convictions on that count.

Moreover, the government's case did not rest solely on the uncorroborated testimony of these two witnesses. Tape recordings support Melvin's testimony about his drug purchases as well as his and Bryant's testimony about Leroy's participation in the conspiracy. The recordings also contradict Henderson's unsupported conjecture of a set-up by Melvin. The defendants object to Melvin's interpretation of the tapes and his identification of Henderson and Leroy's voices, but that objection is nothing more than another challenge to the jury's credibility determination decided against them. *See United States v. Alvarez*, 860 F.2d 801, 809 (7th Cir.1988) (voice identification by unbelievable witnesses goes to the weight of the evidence), *cert. denied*, 490 U.S. 1051, 109 S.Ct. 1966, 104 L.Ed.2d 434 (1989), *vacated on other grounds*, 956 F.2d 1165 (1992). In addition, the police recovered physical evidence, albeit no drugs, from the Irving apartment. The boxes of baggies and baggies with their corners cut off corroborate Bryant's testimony about the conspiracy members' method of packaging the cocaine base. Telephone bills for the Irving apartment and the fact that Henderson rented it connect him to the conspiracy and distribution, while Leroy's visit to the apartment and Bryant's other testimony provide a nexus between Leroy and the conspiracy.

The defendants rely on a credibility challenge to their convictions, a challenge we must reject. We have reviewed the evidence presented and conclude that based on its totality, a rational jury could have found the defendants guilty beyond a reasonable doubt on all charges.

**1150**

## B.

 Separately, Leroy asserts that independent of credibility issues, the government did not present sufficient evidence to convict him under 18 U.S.C. § 924(c). To prove this crime, the government must demonstrate that the defendant used or carried a firearm during and in relation to a drug trafficking offense. *United States v. Jackson,* 51 F.3d 646, 654 (7th Cir.1995); *United States v. Carson,* 9 F.3d 576, 582 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994). The government need not prove that the defendant actually possessed a gun; rather, "[e]vidence that a firearm was in proximity and available for protection during the course of a narcotics offense is sufficient." *United States v. Edwards,* 36 F.3d 639, 644 (7th Cir.1994). And, even without evidence that Leroy himself used a firearm, as a member of the underlying conspiracy he can be held liable upon proof that he could have reasonably foreseen a co-conspirator's use in furtherance of the conspiracy. *United States v. Williams,* 31 F.3d 522, 527 (7th Cir.1994); *see Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946).

 The evidence that Leroy and his co-conspirators used a firearm is more than sufficient. Bryant testified that members of the conspiracy, including Henderson and Leroy, regularly carried firearms. He stated that after someone robbed the Irving apartment and another drug house, they began leaving guns at those locations to provide ready access to co-conspirators, who started answering the door with firearms in hand. Melvin stated that on several of his visits to the Irving apartment, Edwards, a co-conspirator, opened the door carrying a 9 millimeter gun. The recordings, as well as evidence seized from that site, corroborate Melvin and Bryant's testimony. On tape, Edwards twice responded affirmatively when Melvin asked him, after entering the apartment, whether he had a "nine?" The police recovered 9 mm ammunition and a loaded .38 caliber pistol from the Irving location. Finally, Leroy was present at least one time when Edwards brandished the gun, leading to the reasonable inference that he saw Edwards's posses-

sion. The government's failure to introduce the exact gun Edwards allegedly held is not fatal to the verdict. *See United States v. Moore,* 25 F.3d 563, 568 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 341, 130 L.Ed.2d 297 (1994). The totality of this evidence supports a finding that at least one conspiracy member used a firearm in relation to the drug business, and a jury could have found that this use was reasonably foreseeable to Leroy.

## C.

 Leroy also objects to the admission of certain evidence against him, which he states "overwhelms" the evidence connecting him to the conspiracy. We understand these objections as challenges under FED.R.EVID. 403, which prohibits the admission of evidence whose unfair prejudicial value substantially outweighs its probative value, or under FED. R.EVID. 404(b), which prohibits the introduction of "[e]vidence of other crimes, wrongs or acts ... to prove a character of a person ..." We review evidentiary rulings such as these for abuse of discretion. *United States v. Lampkins,* 47 F.3d 175, 179 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S .Ct. 1440, 131 L.Ed.2d 319 (1995).

 First, Leroy contends that the court erroneously allowed his ex-girlfriend to testify that he had called her and told her to lie about whether he owned a car Melvin had seen him in at the Irving apartment the day of the purchase. The government introduced this evidence to show Leroy's consciousness of guilt, and the court gave two limiting instructions admonishing the jury to use it only for that purpose. We have long accepted the admission of evidence of the defendant's attempts to influence a prosecution witness as evincing his guilty conscience for the underlying crimes. *See, e.g., United States v. Shorter,* 54 F.3d 1248, 1260 (7th Cir.1995); *United States v. Marks,* 816 F.2d 1207, 1212 (7th Cir.1987). Here, we do not believe that the district court abused its discretion in concluding that this evidence was more probative than prejudicial and allowing the government to present it.

■ Leroy also objects that Bryant should not have been allowed to testify as to Leroy's involvement in the Streator sales, which occurred before the beginning of the charged conspiracy. Evidence of prior conduct is admissible under FED.R.EVID. 404(b) to show the defendant's knowledge and intent to participate in the crimes charged in the indictment. *See Lampkins,* 47 F.3d at 179. The court instructed the jury to use the evidence only for that purpose. Leroy's prior conduct was related in kind and time to the conspiracy, and the court did not abuse its discretion in admitting it. *Id.* at 179–80.

### III.

### A.

■ Henderson separately challenges the amount of drugs the district court attributed to him in calculating his base offense level under the Sentencing Guidelines. We review the court's findings as to the amount of drugs to ascribe to the defendant for clear error. *United States v. Ferguson,* 35 F.3d 327, 333 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1832, 131 L.Ed.2d 752 (1995). This means that we will affirm the court's findings unless "the entire body of evidence leaves us with the definite and firm conviction that a mistake has been committed." *Id.*

At the sentencing hearing, Bryant described his drug selling activities before and during the charged conspiracy, amounting to a minimum of 874 grams of cocaine base. The court found that the transactions occurring before the start of the conspiracy were relevant conduct properly credited to Henderson. U.S.S.G. § 1B1.3(a)(2). The court then attributed to Henderson, in addition to the 18 grams he had been convicted of selling to Melvin, only 10% of the testified amounts because it could not accept, for several reasons, the full amount Bryant claimed. In reaching this decision, the court referred to Henderson's apparent difficulty in obtaining the full ounce Melvin sought and the lack of testimony concerning any other purchasers visiting the Irving apartment during the many times Melvin was present. The court also discussed the government's failure to seize any other drugs from Henderson and

the absence of any police testimony regarding other sales at any of Henderson's alleged drug houses. Finally, the court emphasized the "vagueness and generalized" nature of Bryant's testimony and the lack of money to support his contentions that he sold such large amounts of drugs. The court therefore attributed to Henderson a total of between 50 and 150 grams of cocaine base, resulting in a base offense level of 32. U.S.S.G. § 2D1.1(c)(4).

■ Henderson properly asserts that a defendant has a right to be sentenced based on testimony with a "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *see also United States v. Beler,* 20 F.3d 1428, 1432 (7th Cir. 1994). Once the district court determined that the 18 grams Melvin had purchased from Henderson did not reflect the true scale of Henderson's offense, it had the duty to approximate the quantity of the controlled substance involved. U.S.S.G. § 2D1.1 application note 12 (the court *"shall* approximate") (emphasis added). We have recognized that this inquiry will not be precise, but the district court may not engage in "nebulous eyeballing." *United States v. Mumford,* 25 F.3d 461, 467 (7th Cir.1994) (quoting *United States v. Duarte,* 950 F.2d 1255, 1263 (7th Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992)); *see also Ferguson,* 35 F.3d at 333 ("The court may make a rough approximation...."). We reiterate that the court's estimate must be based on *reliable* information, *Beler,* 20 F.3d at 1433, and to ensure this we have encouraged district courts to make conservative approximations. *See United States v. Clay,* 37 F.3d 338, 344 (7th Cir.1994). Henderson argues that by accepting only 10% of Bryant's testimony, the court did not simply act conservatively, but instead indicated its belief that Bryant's information was not sufficiently reliable to support any amounts above the 18 grams.

The government responds that Henderson should not complain because the other evidence in the record clearly supports an even higher quantity than the court attributed to him. For instance, based on the number of boxes of plastic baggies found at the Irving

apartment (counting their original capacity), the court could have credited Henderson with 270 grams of cocaine base. We have approved calculations based on drug packaging materials, *see, e.g., United States v. Acevedo,* 28 F.3d 686, 690 (7th Cir.1994), and here the district court stated that the information was "helpful" in corroborating that the conspiracy was larger in scale than any seized or purchased drugs indicated. The court did not, however, adopt this suggestion. Moreover, in *Acevedo,* the bags at issue each contained cocaine residue, thereby sufficiently supporting the court's findings. *Id.* at 690. We question whether multiple boxes of unused baggies present the same degree of reliability.

The government also points to a recorded conversation in which Henderson quotes Melvin a price for a quarter kilogram of cocaine base. The United States asserts that "[a] drug dealer who is captured on tape quoting a price for 250 grams of cocaine base should consider himself very lucky to have been sentenced only for 84 grams."

■ This argument misses the mark. Once again, while the court may have been able to rely on this information, it did not do so. After holding that the 18 grams did not adequately represent the size of the conspiracy, the court was required to approximate its true scale. It could do so either by relying on testimony if found credible in its totality or regarding certain transactions, *see Ferguson,* 35 F.3d at 333, *Mumford,* 25 F.3d at 467, or by relying on corroborating evidence, *see Acevedo,* 28 F.3d at 688. Instead, the court credited Henderson with 10% of the amount described by Bryant. While it never stated that it only found Bryant's testimony 10% credible, the court's methodology gives us substantial pause.

Drug quantity findings "can be supported by the testimony of a single witness who is arguably biased against the defendant," *Mumford,* 25 F.3d at 467, but they must

ultimately be based on *reliable* information. We encourage courts to make conservative estimates, especially when presented with generalized testimony, as a way to meet their duties to approximate drug quantities and do so based on trustworthy information. Without setting any threshold percentage, at some point a court's estimation will seem less like a restrained approximation and more like unsupported conjecture. Here, the court explicitly stated that its 10% multiplier may have been an arbitrary figure, but used it because it found there was significant evidence of a conspiracy. However, "[t]he question under section 2D1.1(a)(3) is not whether the defendant engaged in other sales, but rather, how much cocaine [base] was involved." *Beler,* 20 F.3d at 1436; *see also id.* (" '[A] determination that [the defendant's] drug activity was substantial does not translate readily into a specific drug quantity finding, which is the ultimate issue for sentencing purposes.' ") (quoting *United States v. Miele,* 989 F.2d 659, 668 (3d Cir.1993)). The court could not appropriately choose a random number simply because it believed more drugs were involved than the sales indicated. Its procedure leads us to conclude that the court did not have sufficient faith in Bryant's testimony to use it as the basis for attributing further amounts to Henderson. The government did not meet its burden of proving the quantity of drugs by a preponderance of reliable evidence and the court thus clearly erred.[1]

The government argues that we need not remand because we can affirm the sentence based on any reliable ground found in the record. *United States v. Rivera,* 6 F.3d 431, 447 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1098, 127 L.Ed.2d 411 (1994). It discusses several different calculations which result in amounts within the 50 to 150 gram range applied by the district court. First, the government suggests that we can arrive at the same level by assuming that Bryant sold a pack (3 grams) per day and

---

1. We do not conclusively hold that on remand the court cannot base any findings on Bryant's testimony. *See Beler,* 20 F.3d at 1435 ("Our rejection of the drug quantity estimated in Covington's second affidavit does not bar Covington from providing drug quantity information on re-

mand."). It must, however, explain its findings so that we can have confidence that the court believes that Bryant's testimony is sufficiently credible in certain respects or is corroborated by other reliable evidence.

multiplying it by the number of days he testified he worked in each of several weeks during the charged conspiracy. We will not accept the government's invitation to adopt this calculation because it is based on the same testimony that the district court apparently found unreliable. And, were that evidence sufficiently reliable, we would see no reason to estimate so low.

 Alternatively, the government argues that we can uphold Henderson's sentence based on the number of baggies missing from the boxes seized from the Irving address.[2] Multiplying each of the 190 used baggies by two (Bryant testified that the conspirators cut two corners off each baggie) and multiplying that number (380) by the amount packaged in each corner (.1 gram) results in 38 grams, plus the 18 Melvin purchased. While we are fairly certain that this calculation, supported by Bryant's corroboration of the packaging methods (which the court found credible), would adequately sustain the court's determination, we will not embrace it ourselves. The government first presented this calculation on appeal; the district court, which has sentencing responsibility, has had no opportunity to consider it.

Finally, the government proposes that we can base the quantity on the amount of money seized from Henderson on June 29, 1993, combined with several thousand dollars one of the conspirators told Melvin (on tape) had been robbed from the Irving apartment or another drug location that same day. We have previously affirmed sentences based on the conversion of money to drug amounts. *See, e.g., Rivera,* 6 F.3d at 446 (amount derived by dividing the amount of cash wired to co-conspirators by the price per kilogram as testified to by a witness). We decline to do so here because, while the government introduced this evidence at trial, it did not present the calculations at sentencing. We leave the initial consideration of these sentencing issues to the district court on remand.

We vacate Henderson's sentence and remand for recalculation of the proper amount of drugs attributable to him. We do not vacate Leroy's sentence because he did not challenge it on appeal.

### B.

 Henderson next objects to the sentencing enhancement he received for an obstruction of justice based on jail-house conversations he had with an inmate, Michael Jones ("Michael"), during which Henderson talked of his desire to have Bryant killed. U.S.S.G. § 3C1.1 provides that the court shall increase a defendant's offense level by two if he "attempted to obstruct or impede the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Among the non-exhaustive list of actions constituting an obstruction of justice is "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1, application note 3(a). The enhancement requires a specific intent to obstruct justice, *United States v. Cotts,* 14 F.3d 300, 307 (7th Cir.1994), which the court found Henderson to possess. The court also found that Henderson "willfully attempted to find somebody to prevent Bryant Nolan from testifying" against him and took a substantial step toward that end. The government must prove the appropriateness of the enhancement by a preponderance of the evidence, *United States v. Osborne,* 931 F.2d 1139, 1153 (7th Cir.1991), and we review the court's findings for clear error. *United States v. Johnson,* 46 F.3d 636, 638 (7th Cir.1995).

Henderson argues that the court's findings are clearly erroneous because his discussions with Michael were merely "jail talk," not serious conversations. Moreover, Henderson asserts he never took a substantial step in effectuating the plan, as shown by his failure to contact Michael's cousin, whom Michael said would help Henderson. The court heard a recording of a conversation between

---

**2.** We note that this is a more lenient calculation than the one the United States earlier suggested to demonstrate that the court could have attributed to Henderson an even larger quantity of drugs. The government previously proposed basing the amount on the total number of baggies originally included in the boxes of baggies seized from the Irving apartment, while this computation uses only the number of baggies missing from those containers.

Henderson and Michael in which Henderson said he wanted to "take [Bryant] all the way out." Michael testified that Henderson told him on other occasions of his desire to have Bryant murdered to prevent his testimony. Whether Henderson's conduct evinced the requisite intent or was merely false bravado was a credibility determination left to the sound discretion of the sentencing court, who had the opportunity to listen to the tape and observe the witnesses. *See Osborne,* 931 F.2d at 1153; *see also United States v. Adipietro,* 983 F.2d 1468, 1479 (8th Cir.1993). The court specifically stated that it believed Michael's testimony, as corroborated by the tapes.

 We upheld an obstruction of justice enhancement under similar circumstances in *United States v. Osborne,* 931 F.2d at 1151. There, co-inmates of Osborne testified he had told them he wanted two government witnesses against him to disappear, and stated he could find money to have it done. In the instant case, Henderson took even more action in accordance with his plan; not only did Henderson ask Michael about the possibility of hiring his cousin to take care of Bryant, but he also solicited another man. When Michael asked Henderson why he had not called Michael's cousin, Henderson responded that he had spoken to his own cousin, who was going to do the job. Michael's testimony constitutes sufficient evidence of Henderson's solicitation of the two men to murder Bryant, *see, e.g., United States v. McGill,* 32 F.3d 1138, 1144 (7th Cir.1994) (sentencing court can rely on hearsay; defendant had power to subpoena guard it he had chosen to do so), and much of his testimony was corroborated. The district court did not clearly err in imposing an enhancement for obstruction of justice.

For the foregoing reasons we AFFIRM the convictions of Henderson and Leroy Nolan, VACATE Henderson's sentence and REMAND for resentencing on the issue of the amount of drugs attributable to him.