**UNITED STATES of America,
Plaintiff,**

v.

**Antonio ROSARIO, et al., Defendants.**

No. 97 CR 510.

United States District Court,
N.D. Illinois,
Eastern Division.

June 10, 1999.

Frederick F. Cohn, Frederick F. Cohn Limited, Chicago, IL, for Antonio Rosario aka Project Tony, defendant.

Steven Shobat, Cesar & Shobat, Chicago, IL, for Samuel Santana aka Sam Dog, defendant.

Gary Jay Ravitz, Ravitz & Palles, P.C., Chicago, IL, for Juan Hernandez aka White Tito, defendant.

Victor M. Pilolla, Oak Park, IL, for Carl Stevenson aka Country, defendant.

Carl Peter Clavelli, Chicago, IL, for Wilfredo Hernandez aka Wolfy, defendant.

John M. Beal, Chicago, IL, for Jose Rodriguez aka Boy, defendant.

Robert Allen Korenkiewicz, Chicago, IL, Gerald Joseph Collins, Chicago, IL, for Raul Rosario aka Dice, defendant.

T. Lee Boyd, Jr., The Boyd Law Firm, P.C., Chicago, IL, for Jose Lopez aka Fat Tito aka Tito, defendant.

Scott Jay Frankel, Frankel & Cohen, Chicago, IL, for Keith Palmer, defendant.

Michael James Falconer, Chicago, IL, for Charles Adams aka Chuckie, defendant.

James Andrew Graham, Law Offices of James A. Graham, Chicago, IL, for Darrell Daniels, defendant.

Douglas P. Roller, Roller & Associates, Chicago, IL, for Danny Davis aka Black Danny aka Danny Dawson aka Wheelchair Danny, defendant.

Ronald J. Clark, Chicago, IL, for Orlando Diaz aka Peskie, defendant.

Raymond D. Pijon, Chicago, IL, John Gerard Dombrowski, Chicago, IL, for Marshun Echols aka Smitty, defendant.

Alan R. Brunell, Orland Park, IL, for Sandy Garvin aka Spade, defendant.

Nathan Diamond Falk, Law Offices of Nathan Diamond–Falk, Chicago, IL, for Abraham Hernandez aka Tank, defendant.

John A. Meyer, Law Offices of John A. Meyer, Chicago, IL, for Roosevelt McMullen aka Red, defendant.

Scott Jay Frankel, Frankel & Cohen, Chicago, IL, for Thomas Lee Palmer, defendant.

Bradley Jay Harris, Oak Brook, IL, for Luis Santiago aka Orlando, defendant.

Kent R. Carlson, Chicago, IL, for Gabriel Serrano aka Booby, defendant.

Ronald A. Bredemann, Crystal Lake, IL, for Diane Hernandez aka Joannie aka Joanna, defendant.

Ronald A. Bredemann, Crystal Lake, IL, for Denisse J. Hernandez aka Joanna aka Joannie, defendant.

Madeleine S. Murphy, Asst. U.S. Atty., U.S.Atty.'s Office, Chicago, IL, for U.S.

## MEMORANDUM OPINION ON SENTENCING ISSUES

BUCKLO, District Judge.

In September, 1997, the 20 defendants [1] involved in this case were indicted, charged with conspiracy to distribute cocaine base (more commonly known as "crack" or "crack cocaine"), a Schedule II Narcotic Drug Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). The conspiracy was alleged to have taken place at the Lathrop Homes, a public housing project in Chicago. The conspiracy, as alleged, consisted in using force or the threat of force to keep anyone other than the defendants, members of the "Project Kings," a subgroup of the Latin Kings street gang, from selling drugs at the Lathrop Homes; having "Nation Days" in which all of the members of the conspiracy participated in selling crack cocaine and in which the proceeds went to the gang as a whole; holding meetings at which Nation Days and firearms, among other things, were discussed; and selling crack cocaine on an individual basis on non-Nation Days at the Lathrop Homes. Five of the defendants, including one who became a principal witness in the case, were charged with using persons under 18 years of age, in connection with the conspiracy. The remaining counts of the 34 count indictment charged various individuals with particular sales of crack cocaine. Twelve of the defendants pled guilty to various charges pursuant to plea agreements before trial. Eight defendants went to trial. Most of the defendants were found guilty as charged in the indictment. However, Sandy Garvin was found not guilty of the conspiracy charge. Abraham Hernandez was found not guilty of specific sales. Sentencing of these defendants has been delayed by various reasons.[2]

While I have resolved most of the sentencing issues raised by various motions on the record and in written rulings, this memorandum discusses certain of those issues that substantially affect various sentences.

The most serious question raised in terms of sentencing is the amount of crack that should be attributed to each defendant. Three questions are raised with respect to this issue: (1) Should Sandy Garvin, who was acquitted of the conspiracy charge, nevertheless be sentenced just as if he had been found guilty of conspiracy? (2) What amounts of crack did the government prove, by at least a preponderance of the evidence, were sold pursuant to the conspiracy? (3) Should crack that was sold pursuant to the conspiracy be attributed to defendants who were incarcerated during the time the crack was sold?

### I. Sandy Garvin

■ The government seeks to include the drugs attributable to the conspiracy to Sandy Garvin on the ground that even if the jury did not find the evidence sufficient to convict him of the conspiracy, there is at least a preponderance of the evidence to show that he is guilty of participation in

1. The indictment charged 21 defendants. The only woman charged, the wife of Juan Hernandez, the government's principal witness at trial, was given pretrial diversion as part of Mr. Hernandez' plea agreement with the government.

2. The original schedule was disrupted when a trial witness represented that his testimony had been false and that the government had forced him to testify as he did. The witness subsequently recanted those statements, blaming certain trial defendants for his original letter and affidavit. The need to obtain correctional center records and briefing on the motions resulting from the various representations resulted in vacating the original dates and a delay in other post-trial motions. Other delays were the result of substantial briefing and hearings with regard to the amount of drugs to be attributed to various defendants. Delay was further caused by the fact that the chief prosecutor on the case left the U.S. Attorney's office soon after the trial concluded, resulting in numerous needs for extensions of time to file briefs by the U.S. Attorney's office, and by the number of defendants, most of whom are affected by some of the rulings with respect to any one defendant.

the conspiracy. The Supreme Court has held that a sentencing court may consider conduct for which a defendant has been acquitted if it is supported by a preponderance of the evidence. *U.S. v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 638, 136 L.Ed.2d 554 (1997). It did not hold that this was required but I have at any rate considered the evidence and argument in support of inclusion in this case.

The government's argument appears in part to dispute the jury's verdict. Having heard the evidence (and read the transcript of the trial as well), it is clear to me that the evidence at trial would not support a verdict of guilty as to Mr. Garvin's participation in the charged conspiracy. In support of its argument that Mr. Garvin should be held responsible for all the crack cocaine sold by the conspiracy, despite this acquittal, the government makes two points. First, it argues, the evidence shows that Mr. Garvin was a member of the Latin Kings during the time the conspiracy operated. But at trial, and since, except in conjunction with this motion, the government has expressly disavowed any argument that membership in a gang, even the Latin Kings, is itself a criminal offense. Furthermore, the evidence at trial referred to by the government in its response to Mr. Garvin's objection to inclusion of the conspiracy's drugs in his sentence computation is testimony by Juan Hernandez, the government's principal witness, that Mr. Garvin was "an old king ... he'd been there a long time. So we just let him do what he wanted to." (Tr. 741) The government refers to another witness—a gang member who pled guilty—who testified that Mr. Garvin had been seen "throwing up the crown" (i.e., giving gang signals) when the witness was a child. (Tr. 2276) Neither of these references support the claim that Mr. Garvin should be held responsible for all drugs

sold by the conspiracy, nor are they evidence that Mr. Garvin was a member of the conspiracy. The government's second argument is that Mr. Garvin got a benefit of the conspiracy, in being allowed to join a Nation Day funded trip to the Wisconsin Dells. As will be discussed further below, there was not a lot of evidence about the way money from the conspiracy was spent. Apparently, however, the conspirators, together with others who were not charged with the conspiracy, did go on one trip to the Wisconsin Dells. But since the government agrees that others who went on that trip (outside the charged conspirators) were not members of the conspiracy, the fact that Mr. Garvin also went on the Wisconsin Dells trip does not support its argument that Mr. Garvin was a member of the conspiracy.

Against this evidence is the evidence that connected other members of the conspiracy. The heart of the conspiracy as proved at trial were the Nation Days on which the members worked together to sell crack with the proceeds going to the Project Kings' treasury. There were also meetings (in gang talk, called "demos"), at which Nation Days, guns, membership, discipline, and juveniles, among other things, were discussed. There was no evidence presented at trial that Mr. Garvin attended a single one of these meetings (required, as the government says, for all other members of the gang[3]), or participated in any Nation Day. The evidence with respect to Mr. Garvin was that as an "old retired king" (Tr. 2276), his attempts to sell crack to support his drug habit were tolerated by the conspirators. The jury returned the only verdict that it could have in light of the evidence. I conclude that neither is Mr. Garvin's participation in the conspiracy supported by a preponderance of the evidence.[4]

---

**3.** Every witness testified that gang members were required to attend the "demos."

**4.** Accordingly, I need not consider the government's contention that Mr. Garvin would be entitled to a two-point reduction for minor

role in the conspiracy. The government did not argue that Mr. Garvin should be sentenced on the basis of the drugs sold by the conspiracy or any other ground.

Mr. Garvin was found guilty of four individual sales of crack. While he argues that he should not be held responsible for those sales because the evidence shows only that he assisted in the sales in return for a small amount of crack, I conclude that the verdicts are supported by the evidence. Thus, adding together the amounts of sale (they were all to undercover police), he is responsible for .47 grams of crack cocaine. Contrary to the government's contention, because it put in no evidence with respect to guns apart from the conspiracy evidence, Mr. Garvin will not be given a two-point enhancement pursuant to U.S.S.G. § 2D1.1(b)(1).

## II. Amounts of Crack Proven by a Preponderance of the Evidence

All of the defendants except for Mr. Garvin were convicted of conspiracy to sell crack cocaine. Determining the amount of crack sold on Nation Days pursuant to the conspiracy involves two considerations:[5] How many Nation Days were there and how much crack cocaine was sold on each Nation Day? To begin with, although the government charged in the indictment that the conspiracy began in 1994, in its post-trial official version of the facts, it has represented that the conspiracy ran from July, 1995 when Antonio Rosario was elected head of the Project Kings (in gang language, the "Inca"), until the time of defendants' arrest in July, 1997. (Government's Official Version of the Offense, July 2, 1998, at 3) There is no question that Nation Days (at least in the form on which the government is seeking to calculate the amount of drugs) were held only when Antonio Rosario was the gang's leader.[6] Thus, July, 1995 is the beginning point for considering the amount of crack sold by the conspiracy.

The government contends that the amount of crack sold by the conspiracy totaled 1.5 kilograms. In its official version of the facts, it offered no support for this statement. In a subsequent memorandum filed in response to defendants' objections, the government stated that Juan Hernandez testified that this was the amount of drugs sold; and that it reached the same result by estimating that there was one Nation Day a week, which it has multiplied by 168 (inexplicably stated to be the number of weeks in the conspiracy, although, as noted above, the government elsewhere agreed, and the only evidence so holds, that Nation Days at least for purposes of these calculations did not begin until July, 1995, meaning that there could be only 104 weeks if Nation Days were in fact held each week during this time) times 300 rocks of crack (arrived at by figuring that if each rock weighed .03 grams and using Juan Hernandez' statement that the gang made $3,000 in sales each Nation Day). There is no dispute that each rock sold weighed about .03 grams.

The evidence with respect to the number of Nation Days held during this period varied widely. Juan Hernandez testified that they were held "every week." Another government witness, Darrell Daniels, testified that there were between 20 and 50 Nation Days altogether. Another pleading defendant, Jose Lopez, stated, according to the report of his "proffer" to the government, that there were between one and two Nation Days a month. Two other witnesses at trial, Raul Rosario and Juan Lorenzana, testified that Nation Days were held once a week. However, both witnesses, who were cooperating with the government (Mr. Rosario pursuant to his plea agreement and Mr. Lorenzana pursuant to a grant of immunity and other bene-

---

**5.** I previously ruled on this issue in a minute order, explaining generally my reasons on the record. This opinion explains my conclusions in more detail.

**6.** At trial, a government witness who at one time had been a member of the Project Kings testified that under the prior leadership, there had been a Nation Day, in a different form, about once a month. The government did not prove the amount of drugs sold on these days.

fits [7]), also testified that they used drugs every day during this period.[8] Both witnesses were shown to have difficulty in remembering accurately other facts. Notably, the government did not rely on either of their testimony in their briefs in support of its argument that Nation Days occurred once a week.

In response to my request to the government to identify what corroborating tapes or other evidence it had with respect to the number of Nation Days, the government identified audiotapes that it says shows "that at least seven Nation days occurred during the course of the charged conspiracy...." Government's Response to the Court's Inquiry of February 24, 1999 at 1. In the same response, the government identified videotape evidence to support four of the seven Nation Days identified pursuant to the audiotapes. As the government further notes, it videotaped the area in which the conspiracy occurred on 38 days over a six-month period during the conspiracy. While the videotapes did not cover all of the area of the Lathrop Homes, it did cover an area in which all evidence of record shows Nation Day activity occurred whenever there was a Nation Day. One particular week, the government videotaped every day except Monday and Sunday. There was, however, no evidence that Nation Days ever took place on Sundays or Mondays, the usual day, according to testimony, being Thursday or Saturday. On the week on which videotaping occurred every day except Sunday and Monday, no Nation Day was recorded. Thus, on the one week on which the government has videotape evidence covering virtually every day, there was not a Nation Day. While it is of course conceivable that this was the only week during the entire conspiracy during which there was no Nation Day, the government, with

the burden of proof, presented no evidence to show that this week was aberrational. Thus, the most concrete evidence shows that the testimony that Nation Days were held every week during the period of the conspiracy is not true.

The government also identified two ledgers introduced at trial that it argues support the existence of two of the Nation Days identified by the tapes. However, the tapes and ledgers all support the existence of only seven Nation Days for the entire period of the conspiracy. Other evidence also fails to support the existence of weekly Nation Days. For instance, various witnesses testified that they were told about their shift on Nation Day or what they were to do at gang meetings or "demos." (*E.g.*, Lorenzana, Tr. 1813, 1817) But witnesses testified that the meetings were held once or twice a month. (Tr. 1254, 732) During much of this time the government also had wired an undercover gang member, yet the audiotapes do not cover any Nation Days beyond the seven discussed above.

My conclusion from this various evidence is that the government has not shown by a preponderance of the evidence that Nation Days took place every week during the period of the conspiracy. I initially concluded that three times a month was a more reasonable number. I later determined that the most that I could say that the government had shown by a preponderance of the evidence is that Nation Days took place twice a month. Essentially, as the government states in one of its responses, its argument rests on the testimony of Juan Hernandez. Unlike most of the defendants and cooperating witnesses, Juan Hernandez apparently was not a daily drug user. He did, however, as defendants have noted, have a lot at stake:

---

7. Benefits included payments of $30,000 and probation in a state case. Mr. Lorenzana was 20 years old at the time of trial.

8. Mr. Lorenzana testified that he would smoke an ounce of marijuana a day and that

he was "high all the time." (Tr.2013, 2047) Mr. Rosario testified that he was part of a "sniff crew" who used powder cocaine and that he got high every day. (Tr. 1338–40)

although even with his testimony, he faces 18 years in prison, the videotape and other evidence against him was extremely strong, and given his role as the drug supplier and other matters, he would have faced much longer jail time if convicted. He also gained an agreement to conditionally drop charges against his wife. There was also evidence that connected his father to a drug deal but that the government has not pursued charges. While the government says that all it required was that Mr. Hernandez testify truthfully at trial, I found that much of his testimony was vague, contradicted by objective evidence, and only partly credible. The corroborated evidence and reasonable inferences from the credible evidence as a whole lead me to the conclusion that the estimates of two Nation Days a month given by two gang members are supported by a preponderance of the evidence.

The Seventh Circuit has admonished district courts to "make conservative estimates [of drug quantities], especially when presented with generalized testimony...." *U.S. v. Henderson*, 58 F.3d 1145, 1152 (7th Cir.1995). The court has further noted that "a defendant has a right to be sentenced based on testimony with a 'sufficient indicia of reliability to support its probable accuracy'." *Id.* at 1151, quoting from U.S.S.G. § 6A1.3(a). Defendants argue that under this standard I should find at most seven Nation Days for the whole conspiracy, since there is only corroborating evidence apart from testimony for this number. My judgment that the government has shown two days a month by a preponderance of the evidence reflects my assessment of the evidence as a whole, including external corroborating evidence and my judgment of the credibility and memory of the witnesses.

The government and defendants also dispute the amount of crack sold on each Nation Day. Juan Hernandez testified that three, four or five thousand dollars of crack was sold. The government argues from this testimony that I should find that the conspiracy sold $3,000, amounting to 9 grams (at 300 rocks times .03) of crack on each Nation Day. The government offered very little evidence to support Mr. Hernandez' testimony as to this number, however, and the evidence at trial fails to lend support. Stated generally, the evidence at trial consisted in testimony by various police officers who, acting in an undercover capacity, purchased user quantities of cocaine from various defendants (resulting in the individual charges in the indictment), testimony by cooperating defendants and two former gang members who wore wires during part of the time about which they testified, and video and audiotapes. The tapes provided strong evidence in a number of cases that undoubtedly contributed to the convictions in this case. But they also gave a 135–hour picture (not all of it was played at trial) of the defendants and their activities that often showed that not much was going on. It is true as the government says that the video camera could not pick up night activity and recorded on only one street, although the camera was apparently aimed at the street where the government believed most of the activity was going on (almost all of the evidence concerned activity on this street).[9] In all of the hours of videotape of Nation Days that were displayed at trial, there were few drug sales. It is possible that more activity took place at night, but the government has never presented such evidence. Furthermore, there were audiotapes made from inside, where sales took place on Nation Days, that support the conclusion that not a lot of activity took place (at least not in the amount testified to by Mr. Hernandez) on Nation Days. Thus, in one, on December 14, 1996, there is testimony that at the end of a shift the participants had sold only $200 worth of

9. Juan Hernandez also testified that most of the drug activity took place on this street.

(Tr. 718)

crack. On another shift on the same day, it appears from the audiotape that over a period of three hours there was a sale to one person. A tape on another day, July 20, 1997, indicates that on a recent Nation Day the conspiracy had made only $250. On yet another, it appears from the discussion that the proceeds from a Nation Day were $700. (Tr. 1864–66) On another tape, there is talk indicating that $620 worth of crack had been sold that day. (Tr. 1884) On another day, not a Nation Day, an undercover policeman who had made numerous $10 and $20 purchases from the gang, observed Mr. Garvin and Juan Hernandez get in a scuffle (it is recorded on videotape) over who would get to sell him $10 or $20 worth of crack that day. That does not sound like big business.

There was also testimony from Juan Hernandez about the amount of money in the Project Kings' treasury at various times. Mr. Hernandez kept the treasury himself, and it consisted of money the gang made from Nation Days. At a meeting on December 4, 1996, Mr. Hernandez stated that there was $1,200 and "an eighth," said by Mr. Lorenzana to refer to cocaine. There was no testimony about the drug's value. At the time of the defendants' arrest, in July, 1997, there was essentially no money in the treasury. A ledger obtained by the police in May, 1996, shows that the treasury contained $125 and $3,000 worth of crack (Tr. 775) A tape of a conversation between Mr. Hernandez and his wife in May, 1966, shows the gang having $3,064 (and Mr. Hernandez states he owes the Nation another $1,000).

The government contends that the amounts spent support Mr. Hernandez' testimony with regard to the amount sold on each Nation Day.[10] But the actual evidence at trial (the government never attempted to put in any additional evidence beyond this), does not support its contentions. Thus, the ledger referred to above indicated the gang had spent $6,530 on various things, although the testimony did not show over what period of time these expenditures occurred. There was evidence from both testimony and money order receipts that in December, 1996, Juan Hernandez, at the direction of Antonio Rosario, sent $750 in $50 money orders to various incarcerated gang members. In July, 1997, he sent another $300 in $50 money orders to two imprisoned members. The evidence about the one trip taken by gang members, to the Wisconsin Dells, also contradicts Mr. Hernandez' testimony about the large amounts of drugs allegedly sold on Nation Days. He testified that for 12 persons to go to the Wisconsin Dells, the gang held a Nation Day "for almost a week." (Tr. 729) There was no evidence about how long the 12 people were at the Wisconsin Dells or what they did there, but in the absence of specific evidence it seems reasonable to conclude that they did not likely spend more than a couple of days there or spend huge amounts of money. Yet it took almost a week of Nation Days to finance the trip. The government contends that vast amounts were spent paying for bonds and attorneys' fees for members arrested by the police. But the actual evidence on this was pretty sketchy. In July, 1997, at a gang meeting, Antonio Rosario stated that he had a $15,000 bond outstanding and it appears from his testimony that the money belonged to the gang. In the same tape, Mr. Rosario referred to the payment of $8,000 apparently for the attorney of a gang member. But I have not been referred to other evidence of large expenditures.[11]

---

**10.** I have separated for purposes of discussion the number of Nation Days and the amounts sold on each Nation Day. The amounts in the treasury, and related discussion about amounts spent, obviously are relevant to the number of Nation Days as well.

**11.** Any such evidence was excluded at trial under Fed.R.Evid. 403. The government implied there was a lot of such evidence, which if true, might indeed have lent credence to its contentions about the number of Nation Days and the amounts of crack sold on those days. But in the year since trial, the government never presented any evidence to support the

The testimony about the amounts sold on Nation Day varied widely. But having heard the testimony, and compared it with the lack of evidence of a lot of activity on Nation Days as shown by videotape and audiotape, the small amounts of money in the treasury at various points in the conspiracy, and the lack of evidence of many large expenditures, I find the testimony of Darrell Daniels to be the most convincing. Mr. Daniels wore a wire for the government and testified credibly at trial.[12] According to Mr. Daniels, a shift (there were four per Nation Day) would typically sell from 25 to 50 rocks for $250 to $500. (Tr. 2292) He was not asked more specifically about the number of times only 25 rocks were sold and the number of times 50 were sold. I have therefore used the most conservative of his figures, 25 rocks, which adds up to 100 rocks a day, or $1,000 or 3 grams (100 times .03).

### III. Application of § 1B1.3(a)(1)(B) Where Defendant Is Incarcerated

Several of the defendants were in prison during part of the time the conspiracy operated. The government says each defendant should be responsible for all crack sold on Nation Days from July, 1995 to July 1997, when the remaining members of the conspiracy were arrested, regardless of whether the defendant was incarcerated during part of that time.

Section 1B1.3(a)(1)(B) of the Sentencing Guidelines provides that in the case of a conspiracy or other jointly undertaken activity, the base offense level should be computed "on the basis of ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction...." The government cites conspiracy cases in which courts have said that a conspirator is responsible for all acts in support of the conspiracy until such time as the conspirator withdraws from the conspiracy by admitting his conduct to authorities or announcing to his co-conspirators that he is quitting, in support of its argument for inclusion of crack sold at any time during the two-year period to each defendant.

The defendants fall into three categories in terms of incarceration. Some, for instance Roosevelt McMullen, were in prison preceding July, 1995 and were released at some point thereafter. Mr. McMullen was again arrested before the end of the conspiracy and remained in custody. Still others were arrested at some point after July, 1995 but after some period were released and went back to the conspiracy.

The government has failed to show that the persons who were incarcerated as of July, 1995 can be held accountable for crack sold prior to the time they were released. As noted above, in its official version of the offense, the government conceded that this conspiracy operated from the time Antonio Rosario was elected the head of the gang, in July, 1995, until the arrest of Mr. Rosario and others in July, 1997. The government's present argument is based on the fact that there was testimony that certain defendants who were in prison in July 1995 had previously been members of the gang. But the gang

---

claim. The government relies solely on a mention in the July, 1997 tape, by Antonio Rosario of about "50 G's on the street." There is no corroboration or explanation of this statement, however, and it would appear from listening to the tape that Antonio Rosario was probably under the influence of the drugs he took every day at the time. If his statement was at all supported by evidence, the most likely explanation would have been that it referred to jail bonds (he had earlier been referring to his own). But if so, and it was accurate, the government could have provided evidence that would corroborate the statement.

12. Of all the defendant or cooperating witnesses, I found Mr. Daniels' testimony to be the most consistent with other evidence in numerous respects. I also had the opportunity to observe him at trial and found his testimony to be the most credible of the cooperating witnesses.

is not the conspiracy. The government has offered no evidence to support the premise that any of the incarcerated individuals as of July 1995(a) had any vote in electing Mr. Rosario as Inca; (b) supported the plan to hold regular Nation Days or the form in which they would be held; (c) knew about either of the above; (d) or even had contact with anyone who was in the Lathrop Homes Project Kings. Since the government has conceded that the conspiracy began in July, 1995, it has not shown by a preponderance of the evidence that these defendants reasonably foresaw the sale of the amounts of crack that I have found were sold on Nation Days before they were released from prison and joined the conspiracy or that they engaged in any jointly undertaken criminal activity at that time. The notes to Section 1B1.3 support this exclusion:

"A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct (e.g., in the case of a defendant who joins an ongoing drug conspiracy knowing that it had been selling two kilograms of cocaine per week, the cocaine sold prior to the defendant joining the conspiracy is not included as relevant conduct in determining the defendant's offense level.)" Commentary, Note 2, p. 20 (Nov.1998).[13]

■ I also conclude that Roosevelt McMullen is not responsible for drug sales after he went to prison in January, 1997. A defendant whose participation in a conspiracy is limited to participation in "street sales" on particular days is not responsible for the sale of drugs after he has been incarcerated, despite the fact that he was a member of a conspiracy, because " '[t]he relevant conduct provision limits accomplice attribution to conduct committed in furtherance of the activity the defendant agreed to undertake' [and thus] a defendant cannot be held responsible for conduct committed after he or she could no longer assist or monitor his or her co-conspirators." U.S. v. Price, 13 F.3d 711, 732 (3d Cir.1994), quoting from U.S. v. Collado, 975 F.2d 985, 997 (3d Cir.1992).[14] See also U.S. v. Puig–Infante, 19 F.3d 929, 945–46 (5th Cir.1994).

The evidence in this case showed that Nation Days were held when Antonio Rosario decided to hold them. They were implemented by Juan Hernandez. Obvi-

13. The Guidelines were amended in 1995 to add this clarification, making it clear that conspiracy law is not coextensive with the provision on relevant conduct. Accordingly, any cases to the contrary decided prior to that time do not state current law. See Federal Judicial Center Guideline Sentencing, (Sept. 1998) at 30.

14. On a separate but somewhat related issue, I previously held that Abraham Hernandez was not responsible for drugs sold after he left the conspiracy in February, 1997. The government contended that because he did not go to the authorities and tell them about his involvement or affirmatively tell the other gang members that he had left the conspiracy he was still legally part of the conspiracy. But in his case, going back to the gang to tell them he had quit would have risked serious injury (or even death according to the government) for failing to show up at Nation Days or meetings, or to "hang out" with the gang. And, conversely, because, as the government says, going to gang meetings and Nation Days, and "hanging out" was a requirement of membership, by failing to do these things, Mr. Hernandez was announcing his intention of quitting the conspiracy. This is sufficient. U.S. v. Patel, 879 F.2d, 292, 294 (7th Cir. 1989). No particular language is required. What is needed is some "affirmative action [such as] communication of the abandonment in a manner calculated to reach co-conspirators." Id. While it is more difficult to communicate nonverbally, I found after a hearing that Mr. Hernandez had met his burden of proof. However, even if he had not shown that he left the conspiracy, the government did not show that the drugs sold in the months after he stopped coming to the Lathrop Homes (he did not live there) were reasonably foreseeable to him or that he continued to engage in jointly undertaken criminal activity as required by section 1B1.3 for the reasons stated in this opinion. This is particularly so with respect to Mr. Hernandez, who had been in the gang a short period of time, was young, and had no control over what the gang did.

ously, an incarcerated defendant could neither assist nor monitor the activities of the other defendants on Nation Days. Furthermore, the evidence showed that during the last part of the conspiracy it had become more difficult to hold Nation Days in apartments at Lathrop Homes because of the defendants' awareness that the police were watching them. At least by July, 1997, it appears the defendants were not having Nation Days at an apartment, with prospective purchasers referred inside, as had been the practice throughout the time Mr. Rosario was the gang's leader. Thus, even the practice of Nation Day had changed. Finally, the evidence showed the profits from Nation Days went to the treasury, held by Juan Hernandez. Decisions about what to do with the amounts in the treasury were made by Antonio Rosario. So far as can be seen from the little evidence about how the treasury was spent, his decisions were whimsical. There is no evidence that Mr. McMullen benefitted from any of those Nation Days once he was arrested. The government also presented no evidence that any defendant had any contact with Mr. McMullen in the months between his arrest and the end of the conspiracy, or that Mr. McMullen, who did not live in the Lathrop Homes and had no family there, even knew what was going on at the Lathrop Homes. I conclude that after his arrest Mr. McMullen did not engage in further jointly undertaken criminal activity. *See Guidelines Manual,* § 1B1.3 (Nov.1998), Application Note 2: "[T]he scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy, . . . ." [15]

---

15. There were also periods during the conspiracy in which a defendant was incarcerated for a time but came back to the conspiracy following his release. Since none of those periods appear to affect any defendant's guideline range, I have not addressed them.