**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael FADEYI, Defendant–
Appellant.**

No. 02–2596.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 27, 2004.

Decided March 18, 2004.

Nancy Miller, Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Keri A. Ambrosio, Chicago, IL, for Defendant–Appellant.

Before EASTERBROOK, MANION, and EVANS, Circuit Judges.

## ORDER

Following a bench trial, Michael Fadeyi was convicted of conspiracy to possess heroin with the intent to distribute, in violation of 21 U.S.C. § 846, with one count of attempting to possess heroin with the intent to distribute, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, and one count of knowingly and intentionally distributing a mixture containing approximately 50 grams of heroin, in violation of 21 U.S.C. § 841(a)(1). He was sentenced to 151 months in prison, and an order of forfeiture in the amount of $780,000 was entered. Now before us on appeal, Fadeyi contends that the evidence was insufficient to sustain his conviction and that the forfeiture amount levied against him was improperly calculated.

The evidence at trial showed that from 1990 through 1997 Fadeyi obtained heroin from Thailand and regularly supplied it to the "Mafia Insane Vicelords," a street gang on Chicago's west side. His principal customers were Calvin Hunt and Lennoris Bolden. Hunt, Bolden, and Kenneth Myrick sold the heroin in street transactions. In October 1991, Hunt was convicted of possession of cocaine and sentenced to a term of 6 years. He asked Fadeyi to continue supplying heroin to Myrick and another Vicelord, Hal Swain. When Hunt was released to a halfway house in 1993, he renewed his heroin transactions with Fadeyi. By late 1994 or early 1995, Hunt and Bolden distributed heroin at three principal locations. Fadeyi supplied 50 to 200 grams per week for each spot and charged Bolden and Hunt $14,000 for 100 grams. In February 1996, Fadeyi, in an attempt to more safely conduct his drug business, leased an apartment in the McClurg Court apartment building under fictitious names. Fadeyi, Hunt, and Bolden had keys to the apartment, but Hunt and Bolden were responsible for paying the rent.

In early 1996, Hunt and Bolden renegotiated the terms of their arrangement with Fadeyi and obtained a better price. Rather than paying $14,000 for 100 grams, they paid $30,000 to $40,000 for a kilogram. Under this arrangement, Hunt and Bolden were required to provide Fadeyi with names and addresses of three individuals, who would receive the drug shipments from Thailand. In turn, Fadeyi would tell Hunt and Bolden to whom the payment was to be wired in Thailand. When the packages arrived, Hunt and Bolden gave them to Fadeyi, who would open them and give the men their share of the heroin. Three shipments under the arrangement proceeded without a problem.

The fourth, however, went wrong. German customs seized the packages and delivered them to United States Customs, who in turn forwarded them to the Drug Enforcement Administration. A DEA chemist tested the substance in the packages and determined that it was, in fact, heroin. Sham heroin was substituted in the packages, which were then delivered to the intended recipients. Myrick picked up the packages and met Hunt and Bolden, who began to drive to downtown Chicago to meet Fadeyi. Hunt called Fadeyi to say they were on their way. But Myrick,

Hunt, and Bolden were arrested en route. They were subsequently charged and convicted of conspiracy to possess with the intent to deliver heroin. Fadeyi was not arrested at that time.

Having been sentenced to 20 years incarceration, Hunt decided he was willing to cooperate with the government in an investigation of Fadeyi. Bolden and Myrick soon followed his lead, and Hunt's girlfriend, Saidah Johnson, also agreed to help. She knew Fadeyi and called him to say Hunt needed money for his attorney on appeal and that Hunt wanted Fadeyi to supply her with heroin to sell. She had numerous monitored conversations with Fadeyi to arrange the transaction. Ultimately, a meeting was arranged before which Johnson met with DEA agents, was fitted with a wire, and surveillance was set up. In a motel parking garage Fadeyi gave Johnson a package, which she then gave to the DEA agents. As he left the meeting place, Fadeyi was arrested.

As we said, Fadeyi was convicted in a trial to the court. He now contends that the evidence was insufficient to sustain the conviction. We review such claims in the light most favorable to the government and will overturn a conviction only if no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Hodges*, 315 F.3d 794, 799 (7th Cir.) *cert. denied*, 538 U.S. 1019, 123 S.Ct. 1943, 155 L.Ed.2d 860 (2003); *United States v. Bowman*, 353 F.3d 546 (7th Cir.2003).

To support a conspiracy charge, the government must prove that there was an agreement between Fadeyi and others to commit a crime. *See United States v. Dumes*, 313 F.3d 372 (7th Cir.2002). An agreement to conspire is "typically distinguished by cooperative relationships between the parties that facilitate the achievement of the goal." *United States v.*

*Townsend*, 924 F.2d 1385, 1395 (7th Cir. 1991). The government must show that the defendant "knew of the conspiracy and intended to join and associate himself with its criminal design and purpose." *United States v. Kozinski*, 16 F.3d 795, 808 (7th Cir.1994). To show the link between a defendant and a conspiracy, the government may rely solely on circumstantial evidence. *United States v. Theodosopoulos*, 48 F.3d 1438 (7th Cir.1995).

To sustain the charge in count two of attempted possession with intent to deliver, the government must have proven that Fadeyi acted with specific intent to commit the underlying offense and took a substantial step toward its completion. *United States v. Cea*, 914 F.2d 881, 887 (7th Cir. 1990).

■ There was sufficient evidence to allow the trier of fact to rationally find beyond a reasonable doubt that Fadeyi was guilty of these offenses. The testimony of Hunt and Bolden showed that Fadeyi supplied the heroin for their drug spots. They testified about meeting Fadeyi at various hotels to obtain heroin, about his telling them where to wire money for payment for the heroin. Hunt testified that Fadeyi provided him with a cell phone to use in the operation. Both Hunt and Bolden testified about the three successful drug deals under the newly negotiated terms. They also testified about the fourth deal which was thwarted. Myrick testified about the arrest during the fourth deal as well as the arrangement to have the drugs sent to various people. Saidah Johnson testified as to her decision to cooperate with the government.

But, Fadeyi argues, these witnesses had motive to lie. The trial judge, however, found that they were credible, and we will not second-guess his judgment. *United States v. Henderson*, 58 F.3d 1145 (7th

Cir.1998). Furthermore, the witnesses were all vigorously cross-examined. Hunt, Bolden, and Myrick were questioned regarding the terms of their agreements with the government. Also the testimony was corroborated by other evidence, including Western Union wire transfer receipts, telephone records, lease agreements, Illinois Department of Corrections records, and testimony from the doorman at McClurg Court. The evidence was sufficient to sustain the convictions on counts one and two.

█ Count three is also supported by substantial evidence. This count is a substantive count and involved a March 1 controlled buy Johnson made from Fadeyi. Fadeyi attacks Johnson's credibility and contends that there were gaps in the government's surveillance of the activity surrounding the buy. Again, we will not second-guess the judge's credibility findings. As to the surveillance, the judge agreed that there were gaps but determined that the evidence nevertheless allowed the finding that Fadeyi provided the heroin to Johnson.

The evidence is sufficient to support the finding. Special Agent Charles Manning of the DEA saw Johnson leave the parking garage of a Sheraton Hotel. He followed the car, in which Johnson and Fadeyi were seated, to the parking garage of a Day's Inn. He saw Fadeyi walk from Johnson's parked car over to two men standing near another car and then return to Johnson's car. Johnson was temporarily out of Manning's sight while he went up the ramp of the parking garage, but he met up with her about a minute later, at which time she gave him the heroin she received from Fadeyi. Palos Heights Police Officer George Drikos, who was also involved in the surveillance, followed Fadeyi when he left the hotel. When Drikos was informed

that the drug transaction had occurred, he arrested Fadeyi.

As to the forfeiture, the government concedes that the amount set by the court was incorrect. Accordingly, we will remand the case to the district court for a determination of the correct amount.

The judgment of conviction is AFFIRMED. The forfeiture order is VACATED and the case REMANDED for further proceedings.